**OCHIKUBO v. BONESTEEL et al.**
**YAMAMOTO et al. v. SAME.**
Nos. 3834–PH, 3854–PH.

District Court, S. D. California, Central Division.

June 1, 1945.

918

See, also, 57 F.Supp. 513.

A. L. Wirin, of Los Angeles, Cal., for plaintiff.

Charles H. Carr, U. S. Atty., and Mildred L. Kluckhohn, Asst. U. S. Atty., both of Los Angeles, Cal., and Edward J. Ennis, Director of Alien Enemy Control Unit, of Washington, D. C., for defendants.

HALL, District Judge.

The plaintiffs seek to invalidate and enjoin the enforcement of individual exclusion orders issued by the Commanding General of the Western Defense Command under the authority of Executive Order 9066 of February 19, 1942 (7 F.R. 2320). Appendix I.[1]

Any consideration of Executive Order 9066 must also involve Public Law 503, of March 21, 1942, 56 Stat. 173, 18 U.S.C.A. § 97a. Appendix II.

While the history of Executive Order 9066 and Public Law 503 has been reviewed by the Supreme Court and the Ninth Circuit Court in several cases[2] wherein different phases than here involved of the exercise of powers under Executive Order 9066 were discussed, it will nevertheless be helpful in pointing up the issues in this case if a brief outline is made here of pertinent historical background.

On December 8, 1941, Congress declared war upon Japan.[3] The resolution provided, after formally declaring war, that "The President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the government to carry on war against the imperial government of Japan; and, to bring the conflict to a successful termination, all of the resources of the country are hereby pledged by the Congress of the United States."

The resolution still stands upon the statute books unchanged and unrepealed.

December 7th and 8, 1941 by Presidential Proclamations Nos. 2525, 2526 and 2527 (3 C.F.R. Cum.Supp.1944 273 et seq.) under the authority of 50 U.S.C.A. § 21 et seq., all nationals or subjects of the nations with which we are at war were declared to be enemy aliens and certain restrictive measures were applied, including the power to exclude any alien enemy from "any locality" and the power to summarily apprehend and intern any alien enemy "deemed dangerous". Appendix III.

On December 11, 1941, the Western Defense Command was created within the War Department, including the whole of the States of Washington, Oregon, California, Montana, Idaho, Nevada, Utah and Arizona.

On December 12, 1941, Executive Order 8972 (3 C.F.R. Cum.Supp.1944, p. 1038); Appendix III–A, was promulgated. It recited the serious and immediate potential danger from sabotage, and authorized the

---

[1] Except for Appendix I and Appendix II there is supplied in the Appendix, various letters, orders, reports, etc., which are not easily available in ready reference works, but which are necessary to an understanding of the whole problem.

[2] Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774;

Yasui v. United States, 1943, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793; Korematsu v. United States, 1944, 323 U.S. 214, 65 S.Ct. 193; Ex parte Endo, 1944, 323 U.S. 283, 65 S.Ct. 208; Korematsu v. United States, 9 Cir., 1944, 140 F.2d 289.

[3] Also Germany and Italy.

Army and Navy to establish and maintain military guards and patrols or by other appropriate means to protect "national-defense material", "national-defense premises", and "national-defense utilities", which had been very broadly defined by the Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655, 50 U.S.C.A. §§ 101, 103, 104, 105 and 106.

Between January 2, 1942, and January 5, 1942, there was a conference at San Francisco among representatives of the War and Justice Departments concerning the situation on the West Coast.[4]

On January 4, 1942, the Assistant to the Attorney General who had been designated by the Attorney General to represent him in the conference wrote a communication to the Commanding General of the Western Defense Command containing recommendations about alien enemies (Appendix IV) and on January 5, 1942 the Commanding General responded to that communication (Appendix V) wherein for the first time a question was raised as to the possible treatment of citizens who had dual nationality.

On January 6, 1942, identical memoranda were exchanged between the Commanding General and the Attorney General's representative which treated, however, only with the matter of alien enemies.[5]

On January 14, 1942, by Proclamation No. 2537 (3 C.F.R. 287) issued under Title 50, Section 21 et seq., the registration of alien enemies by the Attorney General was required.

Shortly thereafter, the Attorney General ordered the evacuation of certain limited military zones by only those who were enemy aliens.[6]

On February 2, 1942, the entire Congressional delegation of the West Coast States held a meeting in the office of Senator Johnson to consider the whole problem, which was followed by a number of other meetings.[7]

On February 9, 1942, the Attorney General, by communication, advised the Commanding General he declined to accept the recommendation of the Commanding General concerning mass evacuation for all persons of Japanese ancestry saying as to that "If they have to be evacuated, I believe this would have to be done *as a military necessity*[8] in these particular areas. Such action, therefore, should, in my opinion, be taken *by the War Department* and not by the Department of Justice." Appendix VI.

On February 13, 1942, in a letter to the President, (Appendix VII) the Congressional Delegation of the West Coast States recommended that the "question of citizenship" be eliminated and procedures established "upon the question of loyalty alone." The letter recommended "the immediate evacuation of all persons of Japanese lineage and *all others, aliens and citizens* alike, whose presence shall be *deemed dangerous* or inimical to the defense of the United States, from all strategic areas."

It further recommended that military areas be enlarged, and concluded "We make these recommendations in order that *no citizen*, located in a strategic area may cloak his disloyal or subversive activity under the mantle of his citizenship alone and further to guarantee protection to all loyal persons, alien and citizen alike, whose safety may be endangered by some wanton act of sabotage."[9]

On February 14, 1942, in a memorandum[10] to the Secretary of War the Commanding General recommended among other things general evacuation of all persons of Japanese ancestry regardless of citizenship, as well as other citizens, in the following language:

"b. I now recommend the following

"(1) That the Secretary of War procure from the President direction and authority to designate military areas in the combat zone of the Western Theatre of Operations (if necessary to include the entire combat zone) from which, in his discretion, he may exclude all Japanese, all alien enemies, and all other persons suspected for any reason by the administering military authorities *as being actual or potential* saboteurs, espionage agents, or fifth columnists. * * * The executive order should further provide

---

[4] Final Report, Japanese Evacuation from the West Coast, 1942, by General John L. De Witt.

[5] De Witt Report, pp. 4 and 5.

[6] De Witt Report, p. 6.

[7] House Report 1911 of Tolan Committee, p. 2.

[8] Emphasis supplied throughout and in Appendix, unless otherwise noted.

[9] House Report 1911, p. 3.

[10] De Witt Report, pp. 33 to 38.

that by reason of military necessity *the right of all persons, whether citizens or aliens to reside, enter, cross or be within any military area shall be subject to revocation and shall exist on a pass and permit basis at the discretion of the Secretary of War* and implemented by the necessary legislation imposing penalties for violations."

On February 19, 1942, the President promulgated Executive Order 9066. See Appendix I. The Order specifically provided it was not a limitation on Executive Order 8972. See Appendix III-A.

Immediately after the promulgation of Executive Order 9066, the War Department, with the approval of the President, requested Congress to "enact legislation to provide sanctions for the enforcement of directives issued under the authority of the executive order," and sent a draft of the proposed Act which subsequently became Public Law 503, Appendix IX.

On February 20, 1942, the Secretary of War designated the Commanding General of the Western Defense Command to carry out the duties and responsibilities imposed by Executive Order 9066, and delegated to him within the area of the Western Defense Command the powers given under the Executive Order 9066. Appendix VIII. And on the same day Assistant Secretary of War McCloy by letter [11] sent an outline memorandum suggesting the basis and procedure for dealing with the whole problem. In it there were six classes of persons designated, viz., "Class 1, Japanese aliens; Class 2, American citizens of Japanese lineage; Class 3, German aliens; Class 4, Italian aliens; Class 5, *any persons, whether citizens or aliens,* who are suspected for any reason by you or your responsible subordinate, of being actually or potentially dangerous either as saboteurs, espionage agents, fifth columnists or subversive persons; Class 6, *all other persons who are, or may be within the Western Defense Command."*

It was suggested in this memorandum that there should be progressive stages in order to "provide the maximum protection from sabotage and espionage."

On February 21, 1942, the Tolan Special Committee of the House of Representatives began hearings in San Francisco upon the matter of danger to the West Coast from espionage and sabotage and the general defense of the West Coast.[12]

On March 2, 1942, General De Witt established military areas Nos. 1 and 2, and 100 military zones.[13]  7 F.R. 2320.

On March 10, 1942, he created the Civil Affairs Division of the Western Defense Command.

On March 14, 1942, the Secretary of War transmitted to Congress a letter asking for a change in the wording of the proposed Act which became Law 503, so as to enlarge its sanctions against persons who *"commit any act in"* the military areas contrary to any order of the appropriate Military Commander whether relating to exclusion or not. Appendix X.

On March 16, 1942, by Proclamation No. 2 (7 F.R. 2405) the Commanding General created military areas Nos. 3, 4, 5 and 6 comprising the states of Idaho, Montana, Nevada and Utah, respectively, and established within them an additional 933 zones.[14]

On March 19, 1942, House Report 1911 of the Tolan Committee was filed, and on March 20, 1942, Public Law 503 was passed by Congress and signed by the President on March 21, 1942.

On March 27, 1942, Proclamation No. 4 (7 F.R. 2601) was promulgated by the Commanding General of the Western Defense Command wherein all voluntary migration which had been going on since December, 1941, was ordered stopped as of March 29, 1942.

Following the order of March 27, 1942, the supervised mass evacuation for exclusion and detention of all persons of Japanese ancestry began and was continued to and concluded on July 22, 1942.[15]

This supervised mass evacuation, including as it did only persons of Japanese ancestry, citizen and alien alike, did not, it must be noted, include or concern any other persons or classes of persons. Such other citizens as were considered potentially

---

[11] De Witt Report, pp. 27 to 29.

[12] House Report 1911, p. 4.

[13] On December 23, 1942, by Proclamation No. 14 (8 F.R. 282) all these zones except A-1 and B were eliminated and absorbed in Military Area No. 1, which became a "single prohibited zone."

[14] These zones were also abolished on December 23, 1942, see footnote No. 13.

[15] In General De Witt's Report, page vii, it is stated, "There was neither pattern nor precedent" for the undertaking.

dangerous by the Commanding General, were, from the beginning of the program, handled on an individual exclusion basis.

The evacuation was conducted by the Western Defense Command, but the administration of the detention centers was under the War Relocation Authority, which agency was set up on March 18, 1942, for that purpose by Executive Order No. 9102 (3 C.F.R. Cum.Supp.1944, 1123). The Order specifically provided it was not a limitation on Executive Order 9066.

On December 17, 1944, by Public Proclamation No. 21 (19 F.R. 53) the Commanding General of the Western Defense Command terminated the group exclusion of persons of Japanese ancestry, effective at midnight on January 2, 1945, and declared that thereafter the exclusion of all potentially dangerous persons would be handled on an individual basis. The proclamation continued in force all existing individual exclusion orders.

It is thus seen that the transfer to and extension of the powers of the Commanding General in military areas, over persons who were and are citizens and not alone over alien enemies, was a gradual process. It was based on *"military necessity"* as the Attorney General stated it must be in the quoted communication of February 9, 1942 (see Appendix VI), and as stated in *each order* of the *Commanding General* issued under Executive Order 9066.

While the Assistant Secretary of War designated six classes of persons as above indicated, the exclusion program was conducted generally on the basis only of two classes, those of Japanese ancestry as presenting a group problem, and all other persons as presenting individual problems. No group exclusion having been applied to such other persons, they were allowed to remain in their home area until the Western Defense Command came to the conclusion that their presence in the military area was dangerous, whereupon individual exclusion orders were issued against such persons. It is within the judicial knowledge of the Court that such orders, for instance, were issued against many American citizens who were members of the so-called German American Bund.

During the period, however, of the confinement of the Japanese in the centers, the Western Defense Command completed the individual processing of all Japanese so that at the time of the termination of the mass exclusion on December 17, 1944, a total of approximately 200,000 persons (of whom approximately 120,000 were Japanese) had been individually processed. Appendix XI.

At the time of trial between 9,000 and 10,000 individual exclusion orders had been issued by the Western Defense Command of which something less than a thousand [16] applied to non-Japanese. Of those issued against Japanese, most of them apply to persons who have either asked to be sent back to Japan or renounced their American citizenship, or refused to forswear allegiance to Japan.

All exclusion orders are subject to a "continuing process" of review, by reexamination upon request, but if no such request is made then a periodic review of each file is made at least three times a year.

This processing was done by the Western Defense Command, independent of the War Relocation Authority which began a gradual release of Japanese some time ago, and was evolved and continued without regard to the processing of those alien enemies who were under the jurisdiction of the Attorney General in separate detention centers.

The over-all processing of individual exclusion orders, except for changes from time to time which were minor, involved five general procedural steps by the Western Defense Command, viz.:

*First:* The gathering, summarizing, analyzing and evaluation of intelligence and investigative reports from military, naval, and civil agencies by the Civil Affairs Division of the Western Defense Command, which data is reviewed by the Civil Affairs Division personnel, and then by the officers in charge of the Civil Affairs Division who recommends for or against exclusion to the Commanding General.

*Second:* Review by Commanding General who may determine on non-exclusion or exclusion, in which latter event the subject is notified of his exclusion, and also notified he may have a hearing before a special Board of Officers, designated Individual Exclusion Hearing Board. In the notice of hearing there is set forth a list of things upon which special inquiry is to be made and the subject is notified he will be allowed to present witnesses.

---

[16] General Wilbur desired not to be exact in his figures for obvious security reasons.

*Third:* Hearing before the Individual Exclusion Hearing Board composed of three high ranking officers selected by the Commanding General, at which hearing the subject may present evidence and witnesses, but is not confronted with witnesses against him nor allowed to examine the file concerning him. The Board then makes written findings and recommendations which together with a transcript of testimony is transmitted again to the Civil Affairs Division.

*Fourth:* Civil Affairs Division again reviews, summarizes and analyzes entire file and the Officer in Charge makes his final recommendations for or against exclusion and again transmits it, together with entire file, to the Commanding General.

*Fifth:* After study of entire file Commanding General orders non-exclusion or issues order of exclusion which is transmitted to the subject. This order is final, except for periodic review hereinbefore mentioned.

The order issued against Ochikubo was such a final order. It referred to the temporary exclusion order (Appendix XII) and reads as follows:

"Headquarters Western Defense Command
    "Office of the Commanding General
"Presidio of San Francisco, California
                    21 September 1944
"201—Ochikubo, George Akira—CAD
"Subject: Exclusion.
"To:    George Akira Ochikubo, Central Utah Relocation Project, Topaz, Utah.

"1.    By letter dated 31 August, 1944, you were advised that under the authority of Executive Order No. 9066, dated 19 February, 1942, and letter of the Secretary of War, dated 26 June 1944, and pursuant to the determination that the action therein set forth was dictated by military necessity, you were, pending a hearing before a Board of Officers and pending the determination of the question considered by the Board, prohibited from being in, remaining in, or entering into Military Area No. 1 and the California portion of Military Area No. 2, Western Defense Command, as defined and designated by Public Proclamations Nos. 1, 2 and 16, Headquarters Western Defense Command, dated 2 March 1942, 16 March 1942, and 2 March 1943, respectively.

"2.    On 9 September 1944, you voluntarily appeared before a Board of Officers appointed to determine whether military necessity required your continued exclusion from the above-described areas of the Western Defense Command. After due consideration of the report of the Board and all other data bearing on your case, and pursuant to a determination that the present action is dictated by military necessity, you are hereby notified that your exclusion from the areas described in Paragraph 1, hereof, is continued in full force and effect. This order shall remain in force until revoked in writing by competent authority. The foregoing prohibition shall extend also to any such additional areas as may hereafter be similarly designated, defined and established, but, in such case, a period of ten days from and after the date of the Proclamation or Order establishing additional areas will be permitted for complying with the foregoing requirements as to such additional areas.

"3.    Failure to comply with paragraph 2, hereof, will subject you to the criminal penalties provided by Public Law 503; 77th Congress; approved 21 March 1942, entitled 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.' "

                "C. H. BONESTEEL
                "C. H. Bonesteel,
                    "Major General, U. S. A.
                        Commanding."

The area from which Ochikubo is excluded covers all of the State of California, the Southern portion of Arizona and roughly the coastal half of Oregon and Washington. In the excluded area are approximately nine million of the eleven million population of the Western Defense Command; there is more than thirty per cent of the total national production of aircraft; thirty-nine per cent of merchant ship construction; almost three thousand naval vessels were constructed during the year 1944; approximately a third of the gross cargo shipment of the United States and approximately a third of the hydro-electric power of the United States. In it there are located approximately five hundred army and navy installations, and ten large dams. Ninety-five per cent of all industry within the exclusion zone is engaged in essential war production, which means that the facilities thereof are either "national-

defense material", "national-defense premises" or "national-defense utilities."

There were originally two suits, one wherein the plaintiff Ochikubo was the only party plaintiff and the other wherein the plaintiffs Yamamoto and Shigekawa joined with other plaintiffs who later dismissed. Upon the trial of the action the cases were consolidated for the purpose of hearing evidence. At the conclusion of the trial and upon the motion of the plaintiff for permission to file an amended complaint, which was granted, the cases of Ochikubo, Yamamoto and Shigekawa were consolidated for all purposes.

As thus finally amended the complaint seeks declaratory relief on the assertion that there is an actual justiciable controversy, and also seeks a permanent injunction.

The plaintiff Ochikubo originally sought an injunction pendente lite, but this was denied on the ground that it did not appear from the plaintiff's complaint that the defendants expected or intended or were likely to use force in carrying out the exclusion order against him. Ochikubo v. Bonesteel, D.C., 57 F.Supp. 513; see also Alexander v. De Witt, 9 Cir., 1944, 141 F.2d 573.

After such denial of the injunction pendente lite the defendant however filed an answer wherein he admitted that "the defendants will, if necessary, prevent the plaintiff by physical and military force from entering or remaining in the military areas from which he has been excluded, including the entire State of California."

And in the answer to the amended and supplemental complaint filed after the conclusion of the evidence wherein the action continued against only the defendant Pratt and Bonesteel the defendants made a similar statement in paragraph VI that "The defendant will, if necessary, enforce said individual exclusion orders against the plaintiffs and each of them by physical and military force; will, if necessary, prevent the plaintiffs and each of them from entering the State of California and the City of Los Angeles by physical and military force, and if necessary, by physical and military force remove the plaintiffs from said area in the event the plaintiffs or any of them arrive within the State of California or within said County of Los Angeles."

The contentions of the plaintiff are asserted under two general headings: *First,* lack of substantive due process and *Secondly,* lack of procedural due process.

As to the latter, it is claimed, in summary, that procedural due process is lacking for failure to publish in the Federal Register or to make available to the plaintiff the procedures or rules applicable, or to prescribe any standard of conduct; no adequate charge; no fair hearing with confrontation by and right of cross-examination of witnesses or access to adverse information; that plaintiff was entitled to a hearing before a Military Commission, or military tribunal in accordance with Articles 15 and 38 of the Articles of War, 10 U.S.C.A. §§ 1486, 1509, and that the procedure was contrary to and in violation of Articles of War 17, 18, 19, 22, 23, 25, 34, 35, 36, 46, 48, 50½, and 70, 10 U.S.C.A. §§ 1488–1490, 1493, 1494, 1496, 1505–1507, 1517, 1519, 1522, 1542, and Army Regulation 420–5, as well as the provisions of the Manual for Court Martial, relating to the jurisdiction and powers of and procedure by Military Commissions and other military tribunals; and that in any event the defendant will carry out the exclusion order by force of arms without giving plaintiff an opportunity to seek or secure judicial review by writ of habeas corpus.

As to plaintiffs' first contention, it is claimed that substantive due process is lacking in *that there is no military necessity on the Pacific Coast warranting the exercise of any military jurisdiction or powers over civilians.*

The contentions of the plaintiff that there exists no military necessity on the Pacific Coast warranting the exercise of military jurisdiction over civilians is based upon the assertion that Executive Order 9066 was promulgated at a time when there was imminent danger of military *invasion* from the enemy, and that such imminent danger of military invasion has now passed.

This contention amounts in substance to a request that this court hold as a *matter of fact* that the war in which we are engaged is now in that stage where there is no danger from sabotage or espionage, and conclude as a *matter of law from such fact* that the powers conferred upon Executive Order 9066 are no longer in existence, that is that the Commanding General has no power either to prescribe the Pacific Coast as a military area or to exclude any one therefrom.

This contention is based on the "clear and present danger" rule cases[17], and the doctrine of Ex parte Milligan, 4 Wall 2, 18 L.Ed. 281 and related cases, as best expressed perhaps in Sterling v. Constantin, 278 U.S. 378, 53 S.Ct. 190, 196, 77 L.Ed. 375, in the following language: "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."

This power of judicial review is asserted to include the power to determine whether or not the danger is immediate and impending, such as to not admit of delay, as where the action of the civil authorities would be too late in providing the means the occasion calls for. While the plaintiff concedes that the Supreme Court in Hirabayashi v. United States 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, and Yasui v. United States, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793 (Involving convictions for violation of curfew orders imposed by the Commanding General of the Western Defense Command) and Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193 (involving a conviction under Public Law 503 for violating an exclusion order) held Executive Order 9066 and Public Law 503 to be constitutional and valid, it is nevertheless contended that these decisions are limited to the "conditions" then existing and amount to a holding by the Court that *at the time the orders were applied* a military *invasion* of the Pacific Coast was *threatened and imminent* so as to warrant the issuance of the orders; and that thus this Court must determine *at this time that there is in fact now no military danger to justify the exercise of any power under 9066* and hence the orders are void.

As against the contentions of the plaintiff, government counsel assert that there is procedural due process in that there is no requirement for publication in the Federal Register of the procedure or Rules of the Western Defense Command; that all procedures are in compliance with applicable Army Regulations and Military law in that Army Regulations 400–5 permit the establishment of Boards to perform the functions done by the Board here; that the procedure actually followed accords in fact procedural due process; that Executive Order 9066, being constitutional, jurisdiction

of this Court is limited to determining whether or not the Commanding General acted arbitrarily or capriciously in the issuance of the orders; and that such is not the fact, which, being so, gives the Commanding General the power to execute his orders by forceful removal; and that in any event the proceeding here accords due process to the plaintiffs.

The position of the United States Attorney and the Attorney General in sponsoring and supporting the assertion in the answer of the power of the Commanding General to execute his orders under 9066 by "physical and military force" is in effect that Law 503 is *nothing more than an approval of 9066 and that the sanctions of 503 are a dead letter.*

■ The assertion by the plaintiff that this court has the power to and must determine as a matter of fact that no military necessity exists for their use and hence that the powers delegated under Executive Order 9066 are now at an end, postured against the assertion of the Commanding General that he has the right and power to execute his order issued under Executive Order 9066 by all necessary "physical and military force", and the contentions arising out of those assertions, create an actual justiciable controversy, as to these two propositions so as to give this court jurisdiction under the declaratory relief statute, 28 U.S.C. § 400, 28 U.S.C.A. § 400.

Whether or not a justiciable controversy exists as to the other contentions of the parties depends upon the conclusions reached as to these two questions, which must be resolved first.

The mere statement of the positions of the parties indicates the gravity of the questions involved.

But the seriousness of these questions is heightened when it is considered that, in addition to the above-quoted allegations in the answer, it was asserted from the witness stand (Appendix XIII) that the Commanding General has the power and right to physically remove by "necessary" military force at any time of the day or night *any person, or all persons* from the area of the Western Defense Command who might violate *any* Order or Proclamation of the Commanding General, and this power and right is asserted, not alone against persons of Japanese extraction, but

---

[17] Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, and cases stemming therefrom.

is claimed to exist over "every inhabitant" within the area of the Western Defense Command, regardless of the citizenship, occupation, or any other circumstances of the person or persons involved, except the single circumstances that the Commanding General has, as a matter of military necessity, concluded that such person must be excluded as a potentially dangerous person because such person has violated a fiat of the Commanding General; and the testimony that 25 persons, most, if not all, of whom were citizens, *only one of whom was of Japanese extraction* (See Appendix XIII) had been removed from this area by physical and military force, the last one in October, 1944, by a squad of six armed soldiers and three officers. In the mass evacuation no actual force was used, although it was conducted by the army, and the mass excludees were, and by far the great majority of the presently individually excluded persons are, detained in centers.[18]

The seriousness is further emphasized as, throughout the discussion of counsel and in their briefs, in considering whether or not a plain, speedy, and adequate remedy existed by way of a writ of habeas corpus, the positions of the parties became clear.

The plaintiffs insist that the defendant's admission that the plaintiffs will be taken into custody and forthwith be physically carried out of the State of California by a squad of soldiers using such force as is necessary to remove them, and then left beyond the jurisdiction of this Court, will deprive them of any possible chance of either filing a petition for a writ of habeas corpus or communicating with either lawyer or friends, and will *in effect be a sus-pension of the right to a writ of habeas corpus as to each of them;* and the *defendants then assert that* once any evacuee is removed beyond the boundaries of the State of California and there set free from actual physical custody of the squad of soldiers—although restrained by force from again returning to the State of California,—*habeas corpus will not lie because,* first, the evacuee is not then in actual physical custody, and secondly, the courts where the evacuee then might be would have no jurisdiction of the Commanding General, inasmuch as he has his residence and headquarters in the State of California where are located the only courts having jurisdiction of the defendant, but from whence the evacuee has just been forcibly banished by the defendants. This contention is supported, say the defendants, under the doctrine of Wales v. Whitney, 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277, and the line of cases depending on it.

I.

Before considering the plaintiff's first contention that there is now, as a matter of fact, no military necessity on the Pacific Coast warranting the exercise of any powers under Executive Order 9066, it will be necessary to decide the nature, extent, and scope of the powers of a Military Commander under Executive Order 9066 and Law 503.

If the Commanding General does not have the power to use force to execute his orders as claimed, then it will not be necessary to determine whether or not a writ of habeas corpus would lie under the circumstances as stated.[19]

No such power to execute his orders by

---

[18] The power to use force to accomplish such detention in camps or centers or to guard military installations is not involved in this case. In that connection reference may be had to Executive Order 8972 (Appendix III–A) which was specifically not limited or modified "in any way" by Executive Order 9066.

[19] I do not wish to be understood as considering the question closed, but an open one, in the event a writ of habeas corpus is sought after exclusion by force. Wales v. Whitney, 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277, would certainly not foreclose inquiry on the question, due to the fact that Wales was in the Naval Service and subject, in any event, to the orders of his military superior. Zimmerman v. Walker, 319 U.S. 744, 63 S.Ct. 1027, 87 L.Ed. 1700; Innes v. Crystal, 319 U.S.

755, 63 S.Ct. 1164, 87 L.Ed. 1708, and Lynn v. Downer, 322 U.S. 756, 64 S.Ct. 1263, 88 L.Ed. 1585, are also stated to substantiate the position that a writ would not lie. But it is to be noted that in none of these cases does the Supreme Court cite Wales v. Whitney, which suggest that as to them there are also factual distinctions, should the occasion for the inquiry arise. Moreover, in the Endo case, 323 U.S. 283, 65 S.Ct. 208, the petitioner at the time of hearing had been moved out of the jurisdiction of the court where respondents were and was not then in respondent's actual custody. In Storti v. Massachusetts, 183 U.S. 138, 143, 22 S. Ct. 72, 74, 46 L.Ed. 120 the court said: "The command of the section is to 'dispose of the party as law and justice require.' All the freedom of equity proce-

military and physical force was claimed or considered in either the Hirabayashi, Yasui or Korematsu cases, supra, as each of them was a prosecution under Law 503.

Under the authority of Executive Order 9066, the eight Western States constituting the Western Defense Command were subdivided into six military areas. Most, if not all of the rest of the United States is, or was, included in other Defense Commands, with similar subdivisions into military areas. So that actually the power under Executive Order 9066 of one Commanding General, or another, of one Defense Command, or another, may extend to every person within the continental United States.[20]

The Commanding General, under the wording of Executive Order 9066 may not only exclude *"any or all persons"* but he may also subject *"any or all persons"* who remain in any military area to *"whatever restrictions"* by order or proclamation he "may impose *in his discretion."* The Military Commander may, under the literal reading of the order, *"take such other steps as he * * * may deem advisable to enforce compliance with the restrictions applicable to each Military area * * ** including the use of *Federal troops * * *."*

■ If the powers exists as asserted in the answer and claimed on trial and argument, then an effective means has been found for actually suspending the writ of habeas corpus without appearing to do so,[21] as it would only be necessary for a capricious Commanding General to create a military area which would encompass the territory within which the courts are situated having jurisdiction over him, and then to remove therefrom all persons who might violate whatever restrictions he may impose in his discretion. He might, under his contentions as to power, remove the judges of the courts and the civil authorities.[22] It is not suggested that this is

likely to happen or that any Commanding General would be apt to do so. But the inquiry is on the question of the *extent* of his power. And if these possibilities sound startling, it must be remembered that under Executive Order 9066, curfew was imposed upon a class of more than one hundred thousand persons, most of whom were citizens; that blackout and dim-out regulations applied to *all persons;* that flying regulations are now in existence which apply to *all persons;* that cameras, radios, and other personal property harmless in themselves were denied to the possession of a designated class of citizens exceeding a hundred thousand in number; and that as recently as January 25, 1945, Civilian Restrictive Order No. 33 (Appendix XIV) was issued which applies to *all persons* and prohibits *any person* from transferring or delivering certain designated articles to any excludee, and that as a matter of common knowledge these articles were surrendered to the various sheriffs and Chiefs of Police, so that this order contemplates that if these civil authorities still have such articles in their possession, they are subject to the power of removal by the Commanding General; and that the basis of these, as of every order and proclamation issued by the Commanding General under Executive Order 9066, is his finding that "military necessity" requires them.

If the Military Commander may by military force summarily remove from the State of California (or any other place for that matter) any person which he may decide has violated any of the orders heretofore or hereafter promulgated by him, then surely his power is of the most drastic and absolute kind.

If Executive Order 9066 were standing alone, and if Congress by resolution had *merely* approved it, then it seems to me it would have been a delegation, amounting almost to abdication, of power to the mili-

---

dure is thus prescribed; and substantial justice, promptly administered, is ever the rule in habeas corpus."

[20] The Tolan Committee of the House of Representatives in its May 1942 Report (House Report No. 2124) said, in speaking of the mass evacuations on the West Coast, "To many citizens of alien parentage in this Country it has come as a profound shock that almost overnight thousands of persons have discovered that their citizenship no longer stands between them and the treatment accorded to an enemy alien within our borders in time of war."

[21] Not only suspending the writ, but also depriving a person of the right to test the validity of the order in a criminal proceeding, as well as depriving him of his right to a trial before a military tribunal, which latter seems to have been thought necessary when the writ was suspended. (See 13 Stat. 730 for an instance of Civil War Suspension of writ.)

[22] The historical case of the arrest and removal of the Federal Judge in New Orleans (Judge Hall of another day) by General Jackson is recalled.

tary, to exercise complete control over civilians and civilian authorities in domestic territory, as under it the military commander could by restrictions which he might "impose in his discretion", not only banish the civil authorities as pointed out, but could in fact abrogate any law in any state, and could in fact regulate the lives, conduct, and business of all persons including civilian authorities within his command.

█ If such were the case, then there would be absolute martial law in designated Military Areas, as martial law is defined in the Manual for Court Martial (which must be taken to be a Congressional definition), Chapter I, Par. 2 "Military Jurisdiction—* * * Military Jurisdiction is exercised .* * * by a government temporarily governing the civil population of a locality through its military forces, without the authority of written law, as necessity may require (martial law)."[23]

█ But Executive Order 9066 does not stand alone, it must be read with and as a part of Law 503, as held in the Yasui, Hirabayashi and Korematsu cases, supra. And provisions of Executive Order 9066 which authorize the Military Command to take such steps as he may deem advisable to enforce compliance with his restrictions, including the use of troops, must be particularly considered in light of the fact that immediately after the President promulgated Executive Order 9066 he approved the request of the Secretary of War that Congress enact Law 503 "to provide for the *enforcement* * * * of orders issued under the authority of Executive Order of the President, No. 9066." See Appendix IX and ante. The authority in Executive Order 9066 to use troops must also be considered in the light of the power to use troops, previously granted in Executive Order 8972, which, as heretofore noted, was specifically not affected or modified by Executive Order 9066.

Law 503 leaves the Military Commander the power to impose restrictions and prescribe rules of action, i. e., *law,* which he may consider necessary or desirable to accomplish the mission specifically committed to the military under Executive Order 9066 which was to prevent sabotage and espionage. *And the sole standard is what* in *his judgment is military necessity.*

That it is, and has been, difficult to rationalize the powers of the military under Executive Order 9066 is indicated by the various opinions, both concurring and dissenting, not only in the Supreme Court in the Hirabayashi, Korematsu and Endo cases, but in the Circuit Court in the same cases.

I find no way to rationalize the whole matter except to do as is done in other inquiries, i. e., first determine the general field of law which comes closest to covering the situation. As for instance, in damage suits, the inquiry is first whether or not the claim sounds in tort or contract, different legal principles being applicable in the different fields of law.

So here, in endeavoring to find the applicable rules, the inquiry immediately arises as to whether or not the principles of martial law apply, or some other field of law, such as administrative law, applicable to civilian agencies in peacetime.

As war cannot be permitted to establish the patterns and precedents for peace, by the same token neither peace nor peacetime law can provide the patterns or precedents for war.

Certainly the principles applicable to Executive Order 9066 and Law 503 cannot be classified as administrative law, as the "necessity" upon which administrative delegation is founded is foreseen and determined and "canalized" by the Legislature in advance of the action of the administrative agency, whereas, in the field of martial law that necessity obviously cannot be anticipated and defined and "canalized" by the Legislature in advance, because it depends on *military necessity,* which may change in degree from day to day, and may vary from loose and trivial civilian controls to the most comprehensive and rigid civilian control.

█ Government counsel took the position at the argument that it was unnecessary to determine whether or not martial law is involved and that it was merely a matter of terminology. But I cannot agree with that position, because it seems to me that the power to judicially review an order of a Military Commander made in time of declared war in an area where martial law exists in whole or in part, either after declaration thereof by Congress, or otherwise, is narrower and much more restricted

---

[23] Martial Law is not to be confused with *Military Law* which is the legal system for governance of the affairs of the armed services or with *military* government which is the legal system for the governance of occupied territory.

928

than the power to review any order of an ordinary administrative agency of the Government made in peacetime.

It would be denying the most patent inexorabilities of war to assert that the power of a court in wartime to review a military order, which *includes the power to stay and suspend* such *order while reviewing it,* is comparable to the power of the courts to review an order of a civilian agency or officer of the Government promulgated when the country is not under the imperious necessities of war.

In reviewing the exercise of a delegated power of a civilian agency the complete record of the things upon which the exercise of the power is based, is exposed, but surely it cannot be expected that in time of actual declared war that the military should, before taking effective action to meet a danger, expose its plans, its sources of information, and its knowledge to the world by demonstrating all the things in open court which made the military decision necessary.

The Commanding General's decision is a *military-decision* committed by Congress in its passage of Law 503 *to him to* be made *solely* upon his determination of what is or is not military necessity.

■ And that it is not a mere matter of terminology whether or not qualified martial law exists is further apparent when it is considered that in the making of military decisions—many of which risk and lose much that is dear and irreplaceable—a Military Commander is not bound by the same rigorous limitations on his judgment as civil agencies in the exercise of their powers.

As stated by Judge Stephens in his concurring opinion in the Korematsu case in the Circuit Court of Appeals on December 2, 1943: "How weak indeed our country would be in the kind of world in which we live, if before their validity could be regarded as certain, war strategy orders would have to be ratified and validated by the courts after a trial of facts as to their necessities * * *." [140 F.2d 306].

The argument advanced by government counsel that it is not martial law because the Attorney General might have just as well been designated as the Secretary of War, is answered by the fact that the Attorney General was *not* designated to carry out Executive Order 9066, but that responsibility was placed in the War Department. Moreover, as the Attorney General indicated in his letter (See Appendix VI) the decisions under Executive Order 9066 would have to be based on *"military necessity"* which obviously could only be done by those having intimate knowledge of, and skill in, military matters.

■ While many attempts have been made to describe martial law, and there is much dispute among text book writers and others concerning it,[24] and while it has been said that it "appears, indeed, incapable of exact definition" (In re Duncan, 9 Cir., 146 F.2d 576, 581 nevertheless I believe it may be said without attempt at exactness or completeness that martial law exists when military authorities carry on government or *exercise various degrees of control* over civilians or civilian authorities in domestic territory.

Martial law has been said to be a legal concept by which Anglo-American civil courts have sought in time of disorder to *define the limits* of executive or *military control over civilians* in domestic territory.[25]

Wiener (p. 10) states that martial law in its broad sense is the carrying on of government in domestic territory by military agencies in whole or in part, with the consequent supersession of some or all civil agencies, and further states (p. 12) that where governmental activities are carried on through military instrumentalities, but civil tribunals continue to function, the resulting situation is called *qualified* martial law.

Fairman (23 Ill.L.Rev. 766, 775) states that martial rule may be said to exist in a domestic community when the military rises superior to the civil power in the exercise of some or all of the functions of the government. And also (in his 2nd edition of The Law of Martial Rule p. 47) that it is not a thing absolute in its nature, a matter of all or nothing. On the

---

24 See—Wiener, A Practical Manual of Martial Law; Fairman, The Law of Martial Rule (2nd Ed.); Failman, Vol. LV Harvard Law Review, p. 1253; Graham, Martial Law in California, Vol. 31, Cal. Law Review, p. 6; and War Time Martial Rule in California, by Hon. Earl Warren, Governor of California, California State Bar Journal, Vol. XVII, No. 5, p. 185.

25 Wiener, A Practical Manual of Martial Law, p. 10, note 16 citing 10 Encyc. of the Social Sciences, 162.

contrary, it is measured by the needs of the occasion.

■ It is doubtful if anyone has improved upon the statement by the Chief Justice in the concurring opinion in Ex Parte Milligan (4 Wall. 2 at page 142, 18 L.Ed. 281) where he said that "martial law * * * is called into action by Congress, or temporarily, * * * by the President, in times of * * * war, within districts or localities *where ordinary law no longer adequately secures public safety and private rights.*"

It is obvious that the President in promulgating Executive Order 9066, and that Congress in passing, and the President in approving, Public Law 503, did not consider the public safety to be adequately secured against sabotage and espionage by either the long standing statutes against espionage with the penalties ranging from a maximum of ten years' imprisonment [26] to death [27] or by the 1918 Acts as they were amended in 1940 with the greatly enlarged and broadened definitions of "national-defense material," "national-defense premises" and "national-defense utilities" (50 U.S. C. § 104, 50 U.S.C.A. § 104), or by Executive Order 8972 (Appendix III–A).

If it is not a state or degree of martial law, i. e., if military necessity was and is not the animating basis of Executive Order 9066 and powers exercised under it, then in each instance the military would have to disclose to the world at some place in a public proceeding—during war—the entire evidence upon which they base their decision, including confidential military information, the names of informers, the sources of information, their ability and facilities for securing it, and in addition, moreover, would have to confront each complainant with that data and information and submit to cross-examination.

Such cannot have been the contemplation of Executive Order 9066 and Law 503, as one of the commonest objects of espionage is to ascertain just what the military knows, just who informers are, just what the facilities for gathering information are, and the like, all in order that detection can be circumscribed and prevented.

■ Executive Order 9066 was born of war. Its vitality depends upon the constitutional powers which exist when there is a state of war. Certainly it will not be supposed that any one would urge that if there were no war, the powers assumed and delegated under it would have been approved by Congress or would be sustained by the courts as within Constitutional grants of power from the States and the People to the Federal Government. Without a state of war existing, it would merely be a means of preventing injury to government property, and a means of preventing injury to private property, and it has not yet been suggested that the latter is within the grants of power to the Federal Government under the Constitution, except in time of war. Ordinary criminal sanctions of applicable existing statutes enforceable in the civilian courts of the nation and the states, must in time of peace, be regarded as sufficient to prevent injury to property, either governmentally owned or privately owned. Of course all powers exercised by the Federal Government in time of war, do not necessarily involve martial law—but it seems inescapable to me that the delegation of power here involved to a military commander to make orders—laws governing citizens—the sole standard of which is his determination that military necessity requires them, falls naturally and logically into a classification of martial law, and by Law 503, declared by Congress as qualified martial law, which law, as with all laws, it must not be forgotten, was approved by the President, who is also the Commander in Chief of the military forces.

There can be no doubt that if martial law exists it includes the power to promulgate rules of action over civilians in domestic territory based upon military necessity. Then certainly there is qualified martial law to that extent, but to that extent only. Congress by Law 503 approved that power, and in doing so declared that military necessity, as the Military Commander sees it, to be the standard of these rules of conduct, or the basis for exclusion orders, either mass or individual.

■ To the extent that Executive Order 9066 authorizes a Military Commander to prescribe rules of action—make laws—governing civilians in military areas set up in domestic territory upon the sole standard of military necessity, it is *martial law;* to the extent that Law 503 approves Executive Order 9066, it is *declared martial law;* and to the extent that Law 503 limits Executive Order 9066, it is *qualified martial law.*

---

[26] 50 U.S.C. § 31, 50 U.S.C.A. § 31.

[27] 50 U.S.C. § 32, 50 U.S.C.A. § 32.

I am aware that there are expressions in the Hirabayashi, Korematsu and Endo cases, supra, from which the contrary might be argued.

Repeated statements throughout the opinions indicates the narrowness of the questions decided and in none of them was the right to use force involved. Hence, the expressions in those cases concerning martial law appear to be dicta and not necessary to the decision.[28]

On November 1, 1944 (more than a year after the decision of the Supreme Court in the Hirabayashi case, supra), the Circuit Court of Appeals for the Ninth Circuit said in connection with a discussion of the state of qualified martial law which the court held existed in Hawaii, that in the Pacific Coast States, " * * * *a state of qualified martial law nevertheless existed there more drastic, in certain of its aspects, than that prevailing in Hawaii* * * *." Ex parte Duncan, 9 Cir., 146 F.2d 576 at pages 582, 583.

In an article published in the July–August 1942 Edition of the California State Bar Journal entitled "War-Time Martial Rule in California", the Governor of the State of California stated, "Although few realize it, *federal martial rule is already partially in effect in California* and other sectors of the Pacific Coast."

In an article in the California Law Review in December 1942 (Vol. 131, No. 1 p. 6 et seq.) Col. W. A. Graham, formerly a Judge Advocate of the United States Army (1917–1939 retired) stated: "At this very moment, though the public generally does not realize it, we *in California* are living under conditions of *martial rule;* and we have been so living ever since the 19th day of February, when the President promulgated his Executive Order Number 9066."

In the same article it is further stated: "The fact that a nominally civilian agency is designated to enforce a military order in nowise affects the nature of that order. It is who *makes* the rules that matters—not who is designated to enforce them."

Clearly Executive Order 9066 and Law 503 contemplate and are designed to vest a vast power of decision in the Military Commander, but they also clearly contemplate that *the power to enforce such decisions shall be limited to the penalties of Law 503.*

■ Neither Congress nor the Chief Executive, apparently conscious of the constitutional supremacy of the Civil Authorities, in delegating such vast power over the conduct and lives of the entire population, saw fit to permit the use of military force to execute the orders of the military commander on civilians by a squad of soldiers using such force as is necessary, on the imprimitur of a Military Commander, but preserved the right of civilians to be tried by a jury in the civilian courts with all the safeguards inherent in such procedure, and made such prosecution the exclusive means of enforcement.

That such a construction of Law 503 and Executive Order 9066 must have been in the minds of each of the various Commanding Generals, as well as the Secretary of War and the President, is indicated by several things; *First,* the letter of the Secretary of War asking with the approval of the President that a law be enacted to *enforce* the orders which might be born under 9066 (see Appendix IX and X). *Secondly,* without exception every Civilian Restrictive Order, every proclamation, every exclusion order, mass as well as individual, provide that violation thereof shall subject the violator to the "penalties of Public Law 503, 77th Congress, approved March 21, 1942, entitled 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones,'" although the dim-out and black-out orders also provided that a violator "is subject to immediate exclusion from the territory of the Western Defense Command"; *Thirdly,* none of the orders, exclusion or otherwise, gave any notice or indication that physical force would be used to execute the orders; *Fourthly,* the Commanding General sought and obtained numerous municipal and coun-

---

[28] In this connection I am mindful of the recent admonition of the Supreme Court, which, although addressed to counsel, was no doubt intended to be heeded by Judges as well: "It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion". Armour & Co. v. Wantock, 323 U.S. 126 at page 132, 65 S.Ct. 165 at page 168. I am also not unmindful of the fact that in the last analysis the Judges of the Supreme Court are the final arbiters as to what is or is not dicta in a previous opinion.

ty ordinances, and in some cases State laws, making it an offense to violate such orders.

The Supreme Court in the Hirabayashi case, supra, called attention to the statement on the floor of the House by the Chairman of the Senate Military Affairs Committee, that the purpose of the legislation was *"to provide means of enforcement"* of orders issued under Executive Order 9066, and the Court held that by Law 503 Congress *"implemented"* the orders. Now, if the Commanding General had the power under Executive Order 9066 to use force to execute his orders, then he needed no law to "provide means of enforcement" or to "implement" such orders.

That Law 503 was intended to be the exclusive means of enforcing orders issued under Executive Order 9066 is further indicated by the remarks of Congressman Costello in submitting the report on what became Law 503. Among other things he said: "To make such removal *effective,* it is necessary to provide for penalties in the event of any violation of the orders of restrictions which may be established, as well as to *enforce curfews,* where they may be *required.*[29]

The limitation of Law 503 on the power of the military to use force to execute orders promulgated under Executive Order 9066, cannot be taken as a limitation on the power of the military to use force in guarding camps, installations, etc., under Executive Order 8972 which is specifically exempted from the operation of Executive Order 9066 and which as heretofore pointed out is also a measure for the protection of "national-defense material, national-defense premises, and national defense utilities."

■ Executive Order 9066 and Law 503, taken together, were not designed to supplant but to supplement and aid the civil authorities in carrying out their duties of prosecution and punishment under ordinary law as expressed in existing legislation. Title 50 U.S.C. §§ 31, 32, 33, 34, 45, 101, 104, 105, 106, 21 and 24, 50 U.S.C.A. 31–34, 45, 101, 104–106 and 21, 24; 8 U.S.C. 451 et seq., 8 U.S.C.A. § 451 et seq.; 18 U.S.C. § 6, 9–14 and 88, 18 U.S.C.A. §§ 6, 9–14, 88, as well as the Acts of Congress which are called the Articles of War, 10 U.S.C.A. § 1471 et seq.

The limitations of Law 503 on Executive Order 9066 does not however com-

pletely prevent the army from using "federal troops" in carrying out orders made under Executive Order 9066. There are Army Regulations which are applicable and which cover such a situation.

In that connection, Army Regulation 600–355 (10 C.F.R.Cum.Supp.1944, page 2692) was promulgated on July 17th, 1942, which was subsequent to Executive Order 9066 of February 19, 1942, and Law 503 of March 21st, 1942. It must therefore be considered in connection with them and as applicable to the powers conferred by Executive Order 9066. It provides a limitation on the power of the army over persons who are not subject to military law, and it is conceded by the defendants that the plaintiffs are not subject to military law. This regulation limits the power "by members of the Military Establishment" to the power to make an arrest if a misdemeanor of the nature prescribed by Law 503 is being committed, and provides *"Restraint.* The restraint imposed * * * will not exceed that reasonably necessary (i. e., to make the arrest) nor extend beyond such time as may be required to dispose of the case by orderly transfer of custody to civil authority or otherwise, under the law." Appendix XV.

■ On this point, I therefore conclude, that, the Commanding General does not have the power to enforce the exclusion order against the plaintiffs by physical and military force as asserted in his answer, but that he does have the power by the terms of Executive Order 9066 and Law 503 to prescribe rules of conduct for—including exclusion of—"any person", or "all persons" within the area of his command, upon a finding by him that "military necessity" requires it; and, he does have the power under Army Regulation 600–355 in the event of an asserted violation of such an order to arrest the asserted violator, and using such force as is reasonably necessary to bring him before a United States Commissioner or other committing magistrate and swear out a complaint for violation of Public Law 503, or to transfer him to the custody of the United States Marshal to hold for action by the United States District Attorney.

This does not affect the powers of the States or subdivisions thereof to prosecute offenses under laws passed by them making it an offense to violate an order of the Commanding General issued under Execu-

---

[29] House Report 1911, page 11.

932

tive Order 9066. That question is not here for decision.

Nor is the question here for decision as to the possible liability in damages of members of the military establishment for using military force to execute an exclusion order.

II.

The nature, scope, and extent of the powers of the Commanding General being thus defined under Executive Order 9066 and Law 503, so that a state of qualified martial law exists needing but military necessity as determined by the Commanding General to animate those powers, I will turn to the contention of the plaintiffs that no *military necessity now exists* on the Pacific Coast or in the area of the Western Defense Command to warrant the exercise of *any* powers under Executive Order 9066, in effect that 9066 is now a complete nullity; and that hence, the Commanding General has *no powers* under 9066 either to prescribe military areas or otherwise.

As previously indicated, plaintiffs' contention that no military necessity now exists so as to vivify the powers of Executive Order 9066 is premised upon the proposition that there is *now* no danger of *military invasion,* such as existed at the time of promulgation of Executive Order 9066.

This argument was probably originally induced by language in Public Proclamation No. 1 (7 F. R. 2320) reading as follows: "Whereas the Western Defense Command embraces the entire Pacific Coast of the United States which by its geographical location is particularly subject to attack, to attempted invasion by the armed force of nations with which the United States is (sic) now at war, and in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations."

But the argument overlooks several things; first, that in the event of an actual or attempted or even imminent invasion, it is doubtful if any authority by Executive Order or additional statutes would have been, or would be, needed by the appropriate military commander to require even complete evacuation of any particular area; second, Executive Order 9066 says not a word about invasion, either threatened or imminent,—it is in furtherance of the "successful prosecution of the war" and is

founded upon the necessity in modern war of preventing sabotage and espionage concerning "national-defense material, national-defense premises, and national-defense utilities", wherever located; third, the primary purpose of Proclamation No. 1 was to *define military areas* as authorized by Executive Order 9066; fourth, that Public Proclamation No. 21 (10 F. R. 53) of December 17, 1944, rescinding the mass exclusion order, but continuing in effect all individual exclusion orders, after stating that there was "substantial improvement in the military situation" recited as a fact that: "Whereas, there is still reasonable possibility of hostile acts against the West Coast area of the United States and this possibility of enemy action requires adequate measures to prevent aid and comfort to the enemy and to prevent the commission of sabotage and espionage separately or in connection therewith."

The contention fails to take into consideration the patent fact, so awful in its consequence, that modern wars are not limited to clashes at arms on particular fields of battle of comparatively insignificant area, but are exertions of the complete strength and ingenuity of all our people and all our resources wherever located, against the complete strength and ingenuity of the enemy and all their resources, wherever located.

It also fails to take into consideration, so far as the "clear and present danger" rule is concerned, the fact that that was settled by the Congress and the Chief Executive of the United States in the Declaration of War, which pledged the entire resources of the Nation, and also in the passage of Law 503.

The clear and present danger in modern war was and is not just the extremity of military danger—actual and imminent invasion—but as declared by Congress in Law 503 in approving Executive Order 9066 was, and is, danger from sabotage and espionage. Executive Order 9066 was not aimed at invasion, it was aimed at the prevention of sabotage and espionage. The peculiar vulnerability of Military Area No. 1 to devastating forest fires and the far-reaching consequences of injury to or destruction of its vast water supply systems, as well as its other important features hereinbefore pointed out, cannot be overlooked in connection with military commitments of this country.

Sabotage—destruction of the things to make war possible, and espionage—information concerning not just military dispositions, but as well concerning the power to make war—are just as serious in their consequence, if not more so, in modern warfare, than an actual invasion by armed men. The importance of the destruction of the things to make war with is demonstrated in the war on Germany. An invasion at arms might be contained, but sabotage and espionage have for their purpose, and if complete enough, can destroy the power to resist, more fatal in its military consequence, than a temporary military setback.

While it is true as contended by plaintiffs that in the Hirabayashi, Korematsu and Yasui, supra, as well as the Quirin[30] and Endo cases, supra, the Supreme Court did not disaffirm the doctrines of Ex parte Milligan, or Sterling v. Constantin, supra, concerning the power of federal review, surely it was not contemplated or intended that in the time of this war, in the face of the Declaration of War by Congress and the approval by Congress of Executive Order 9066 and Law 503, and in the face of the awful actualities of the war itself, which has engulfed the whole world, civilized and uncivilized, and affects every person in the world, that the judgment of one man— myself in this instance—sitting as a judge by the accidents of fortune, should be substituted for the combined intelligence and judgment of Congress, the President, the Secretary of War, the combined Chiefs of the Military Staff of the United States, the Commanding General and the Military Establishment under his command, all of whom are charged under our·constitutional system with the power and responsibility of not only making the decisions growing out of the power to make war, but with executing them.

And to yield to the contentions of the plaintiffs that Executive Order 9066 is now a nullity, because there is now no military necessity for its use, would be to do just that.

In the Hirabayashi case (320 U.S. at page 93, 63 S.Ct. 1382, 87 L.Ed. 1774) the Supreme Court said that where "the *conditions* call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any

court to sit in review of the wisdom of their action or substitute its judgment for theirs."

Executive Order 9066 was "conditioned" upon the "successful prosecution of the war"; the "choices of means" Congress and the President made by Executive Order 9066 and Law 503, to aid in the successful prosecution of the war, was to prevent sabotage and espionage by lodging in the appropriate Military Commander the power, upon his judgment and discretion, to create military areas and make orders— including exclusion orders—which might affect any persons or all persons in such areas.

Said Judge Stephens in Korematsu v. United States, 9 Cir., 140 F.2d 289 at page 306: "There is no sanction in our governmental scheme for the courts to assume an overall wisdom and superior virtue and take unto themselves the power to visé the Acts of Congress and the President upon war matters so long as such acts are not in conflict with the provisions of the Constitution itself."

It seems clear to me therefore, and I so hold, that so long as the Declaration of War by Congress is in force, and so long as the war continues, the "conditions" are still in existence which preclude this court from any inquiry or decision which would nullify Executive Order 9066, as modified and limited by Law 503, or which would terminate the powers of a Commanding General to act under that Order as so modified, either to create military areas or otherwise.

It follows that Executive Order 9066 is in full force and effect, as limited by Law 503.

The views expressed herein as to Points I and II are applicable with equal force to the orders issued against Yamamoto and Skigekawa. The temporary orders against them became as final as the Ochikubo order because of their declination to have a hearing before a Board.

III.

Turning now to the remaining contentions of the parties concerning the validity of the individual orders against Ochikubo, Yamamoto, and Skigekawa, the question arises as to whether or not a justiciable controversy exists in view of my

---

30 317 U.S. 1, 63 S.Ct. 1, 2, 87 L.Ed. 3.

conclusions on the previously discussed matters.

As indicated, the Commanding General has no power to remove the plaintiffs from this jurisdiction by force, hence they cannot be deprived of their right to file a writ of habeas corpus, if one would otherwise lie.

And, as indicated, a criminal prosecution under Law 503 is the exclusive means of enforcement of orders issued under Executive Order 9066.

Neither may ever occur. It may be that no prosecution may ever be had, and it may be that no occasion may ever arise for filing a petition for a writ of habeas corpus.

In the event either one or the other occurs, and the proceeding is not otherwise vulnerable, all the contentions of the plaintiffs which have been urged as to the invalidity of the individual orders in question, if they can be raised at all, may be urged and considered and decided in such a proceeding. The Hirabayshi, Yasui, and Korematsu cases, supra, were all prosecutions under Law 503. From none of them does it conclusively appear that a defendant would be precluded from contesting the *validity* of a particular order for the violation of which he might be prosecuted by raising all of the questions herein raised and not decided.[31]

Consequently, any discussion or decision on the validity of the individual orders upon the plaintiffs would amount to an advisory judgment. That is beyond the judicial power under the declaratory judgments act. State Mutual Life Assurance Co. of Worcester, Mass. v. Webster, 9 Cir., 148 F.2d 315.

Counsel for the Government suggested at the trial that I proceed to a decision on the contentions raised as to the validity of the individual orders in any event, but to do so would be to assume powers which I am precluded from taking, howsoever much I appreciate the desire of the parties to have a court decision on the questions as to procedural due process, the applicability of army regulations, publication of procedures in the Federal Register and the extent and character of review, as well as the other questions flowing from these matters. These questions can be settled in their own proper time when raised in an appropriate proceeding.

I conclude on this point therefore that the plaintiffs have their plain, speedy, and

[31] It was the contention of the plaintiff, not vigorously disputed by the defendant, that under the Falbo case (320 U. S. 549, 64 S.Ct. 346, 88 L.Ed. 305) a grave doubt existed as to whether or not in a prosecution under Law 503, a defendant could contest the validity of the order for the violation of which he was being prosecuted, but would be limited to a showing as to whether or not he had knowledge of the order and had disobeyed it. In the event of a prosecution under Law 503, I do not wish to be understood as acceding to that contention but to consider the question either settled by the decision in the Hirabayshi, Yasui and Korematsu cases, supra, which were criminal prosecutions under Law 503, or an open question.

In placing Executive Order 9066 alongside of the Selective Service Act, 50 U.S. C.A.Appendix § 301 et seq. (under which the Falbo case arose) it is immediately apparent that there is no similarity between the two. Executive Order 9066 is simply a blank check to the Military Commander to be drawn by him as military necessity requires, and bears no semblance to the detailed provisions of the Selective Service Act; the Order on its face creates neither tribunal, court, nor Board, comparable to the more than 6,000 Local Boards and the many Appeal Boards set up under the Selective Service Act, none of the members of which can be attached to the military arm of the Government; the Order prescribes no standards of procedures for the governance of the conduct of the Commanding General, except the single one of military necessity as he might determine, whereas the Selective Service Law is more detailed in this particular than the average statute; the Order covers "all persons"; whereas, the Selective Service Law is not only limited to male persons between certain ages, but specifically exempts certain classes of persons; the military Commander is not authorized to, and he does not prescribe rules from which any person can determine whether or not certain conduct will class him as a potential spy or saboteur, such as the multitudinous rules and regulations authorized to be, and promulgated from time to time, under the Selective Service Act, from which a person can determine whether or not his conduct will place him in a 1A classification, or in one of the various deferred classifications. Differences could be cumulated, but enough has been said to indicate that the question is at least not closed by the Falbo case against inquiry as to the limits to which a court might go on trial under Law 503.

adequate remedy at law, and that there is no justiciable controversy in this proceeding as to the question raised and not herein decided concerning the validity of the individual exclusion orders.

The foregoing will serve as Findings of Fact, and Conclusions of Law.

The parties will prepare and submit a formal judgment in accordance herewith.

## Appendix I

### Executive Order No. 9066

#### Authorizing the Secretary of War to Prescribe Military Areas

"Whereas The successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U.S.C. Title 50, Sec. 104 [50 U.S.C.A. § 104]):

"Now, therefore, By virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary, in the judgment of the Secretary of War or the said Military Commander, and until other arrangements are made, to accomplish the purpose of this order. The designation of military areas in any region or locality shall supersede designations of prohibited and restricted areas by the Attorney General under the Proclamations of December 7 and 8, 1941, and shall supersede the responsibility and authority of the Attorney General under the said Proclamations in respect of such prohibited and restricted areas.

"I hereby further authorize and direct the Secretary of War and the said Military Commanders to take such other steps as he or the appropriate Military Commander may deem advisable to enforce compliance with the restrictions applicable to each Military area hereinabove authorized to be designated, including the use of Federal troops and other Federal Agencies, with authority to accept assistance of state and local agencies.

"I hereby further authorize and direct all Executive Departments, independent establishments and other Federal Agencies, to assist the Secretary of War or the said Military Commanders in carrying out this Executive Order, including the furnishing of medical aid, hospitalization, food, clothing, transportation, use of land, shelter, and other supplies, equipment, utilities, facilities, and services.

"This order shall not be construed as modifying or limiting in any way the authority heretofore granted under Executive Order No. 8972, dated December 12, 1941, nor shall it be construed as limiting or modifying the duty and responsibility of the Federal Bureau of Investigation, with respect to the investigation of alleged acts of sabotage or the duty and responsibility of the Attorney General and the Department of Justice under the Proclamations of December 7 and 8, 1941, prescribing regulations for the conduct and control of alien enemies, except as such duty and responsibility is superseded by the designation of military areas hereunder.

"Franklin D. Roosevelt

"The White House, February 19, 1942."

## Appendix II

### Public Law No. 503

#### "An Act

"To provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by

the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both for each offense.

"Approved March 21, 1942"

56 Stat. 173, 18 U.S.C.A. § 97a.

## Appendix III

"Proclamation 2525

"(Alien Enemies—Japanese)

"Authority

"Whereas it is provided by Section 21 of Title 50 of the United States Code [50 U.S.C.A. § 21] as follows:

\* \* \* \* \* \*

"Whereas by Sections 22, 23 and 24 of Title 50 of the United States Code [50 U.S. C.A. §§ 22–24] further provision is made relative to alien enemies:

"Proclamation

"Now, Therefore, I, Franklin D. Roosevelt, as President of the United States, and as Commander in Chief of the Army and Navy of the United States, do hereby make public proclamation to all whom it may concern that an invasion has been perpetrated upon the territory of the United States by the Empire of Japan.

"Conduct to be Observed by Alien Enemies

"And, acting under and by virtue of the authority vested in me by the Constitution of the United States and the said sections of the United States Code, I do hereby further proclaim and direct that the conduct to be observed on the part of the United States toward all natives, citizens, denizens or subjects of the Empire of Japan being of the age of fourteen years and upwards who shall be within the United States or within any territories in any way subject to the jurisdiction of the United States and not actually naturalized, who for the purpose of this Proclamation and under such sections of the United States Code are termed alien enemies, shall be as follows:

"All alien enemies are enjoined to preserve the peace towards the United States and to refrain from crime against the public safety, and from violating the laws of the United States and of the States and Territories thereof; and to refrain from actual hostility or giving information, aid or comfort to the enemies of the United States or *interfering by word or deed with the defense of the United States or the political processes and public opinions thereof*; and to comply strictly with the regulations which are hereby or which may be from time to time promulgated by the President.

"All alien enemies shall be liable to restraint, or to give security, or to remove and depart from the United States in the manner prescribed by Sections 23 and 24 of Title 50 of the United States Code, and as prescribed in the regulations duly promulgated by the President.

\* \* \* \* \* \*

"Regulations

"And, pursuant to the authority vested in me, *I hereby declare and establish the following regulations which* I find necessary in the premises and for the public safety:

"(1) No alien enemy shall enter or be found within the Canal Zone and no alien enemy shall enter or leave the Hawaiian Islands or the Philippine Islands except under such regulations as the Secretary of War shall from time to time prescribe. Any alien enemy found in the *Canal Zone,* the *Hawaiian Islands,* or the *Philippine Islands* in violation of any such regulations and any alien enemy who enters or is found within any restricted area to be hereafter prescribed by the Military Commanders of each such territory in the *Canal Zone,* the *Hawaiian Islands,* and the *Philippine Islands,* may be immediately apprehended by authority of the Military Governors in each such territory, or if there be no Military Governor, then by authority of the Secretary of War, and detained until it is determined, under the regulations to be prescribed by the Secretary of War, whether any such alien enemy should be permanently interned following which such alien enemy shall either be released, released on bond, or permanently interned, as the case may be.

\* \* \* \* \* \*

"(5) No alien enemy shall have in his possession, custody or control at any time or place or use or operate any of the following enumerated articles:

"a. Firearms.

"b. Weapons or implements of war or component parts thereof.

"c. Ammunition.

"d. Bombs.

"e. Explosives or material used in the manufacture of explosives.

"f. Short-wave radio receiving sets.

"g. Transmitting sets.

"h. Signal devices.

"i. Codes or ciphers.

"j. Cameras.

"k. Papers, documents or books in which there may be invisible writing; photograph, sketch, picture, drawing, map or graphical representation of any military or naval installations or equipment or of any arms, ammunition, implements of war, device or thing used or intended to be used in the combat equipment of the land or naval forces of the United States or of any military or naval post, camp or station.

"All such property found in the possession of any alien enemy in violation of the foregoing regulations shall be subject to seizure and forfeiture.

"(6) No alien enemy shall undertake any air flight or ascend into the air in any airplane, aircraft or balloon of any sort whether owned governmentally, commercially or privately, except that travel by an alien enemy in an airplane or aircraft may be authorized by the Attorney General, or his representative, or the Secretary of War, or his representative, in their respective jurisdictions, under such regulations as they shall prescribe.

"(7) Alien enemies *deemed dangerous* to the public peace or safety of the United States by the Attorney General or the Secretary of War, as the case may be, are subject to summary apprehension. Such apprehension shall be made in the *continental United States,* Alaska, Puerto Rico and the Virgin Islands by such duly authorized officer of the Department of Justice as the Attorney General may determine. In the Canal Zone, the Hawaiian Islands and the Philippine Islands, such arrests shall be made by the Military Commanders in each such territory by authority of the respective Military Governors thereof, and if there be no Military Governor, then by authority of the Secretary of War. Alien enemies arrested shall be subject to confinement in such place of detention as may be directed by the officers responsible for the execution of these regulations and for the arrest, detention and interment of alien enemies in each case,

\*　　\*　　\*　　\*　　\*　　\*

"(9) Whenever the Attorney General of the United States, with respect to the *continental* United States, Alaska, Puerto Rico and the Virgin Islands, or the Secretary of War, with respect to the Canal Zone, the Hawaiian Islands, and the Philippine Islands, deems it to be necessary, for the public safety and protection, to exclude alien enemies from a designated area, surrounding any fort, camp, arsenal, airport, landing field, aircraft station, electric or other power plant, hydroelectric dam, government naval vessel, navy yard, pier, dock, dry dock, or any factory, foundry, plant, workshop, storage yard, or warehouse for the manufacture of munitions or implements of war or anything of any kind, nature or description for the use of the Army, the Navy or any country allied or associated with the United States, or in any wise connected with the national defense of the United States, *or from any locality in which residence by an alien enemy shall be found* to constitute a danger to the public peace and safety of the United States or from a designated area surrounding any canal or any wharf, pier, dock or dry dock used by ships or vessels of any designated tonnage engaged in foreign or domestic trade, or of any warehouse, shed, elevator, railroad terminal, depot or yard or other terminal, storage or transfer facility, then no alien enemy shall be found within such area or the immediate vicinity thereof. Any *alien enemy* found within *any such* area or the immediate vicinity thereof prescribed by the Attorney General or the *Secretary of War,* as the case may be, pursuant to these regulations, shall be subject to summary apprehension and to be dealt with as hereinabove prescribed.

"(10) With respect to the *continental* United States, Alaska, Puerto Rico, and the Virgin Islands, an alien enemy shall not change his place of abode or occupation or otherwise travel or move from place to place without full compliance with any such regulations as the Attorney General of the United States may, from time to time, make and declare; and the Attorney General is hereby authorized to make and declare, from time to time, such regulations concerning the movements of alien enemies within the continental United States, Alas-

938

ka, Puerto Rico and the Virgin Islands, as he may deem necessary in the premises and for the public safety.

\* \* \* \* \* \*

"(12) No alien enemy shall enter or be found in or upon any highway, waterway, airway, railway, railroad, subway, public utility, building, place or thing not open and accessible to the public generally, and not generally used by the public.

"(13) No alien enemy shall be a member or an officer of, or affiliated with, any organization, group or assembly hereafter designated by the Attorney General, nor shall any alien enemy advocate, defend or subscribe to the acts, principles or policies thereof, attend any meetings, conventions or gatherings thereof or possess or distribute any literature, propaganda or other writings or productions thereof.

"This proclamation and the regulations herein contained shall extend and apply to all land and water, continental or insular, in any way within the jurisdiction of the United States.

"In Witness Whereof, I have hereunto set my hand and caused the seal of the United States of America to be affixed.

"Done at the City of Washington this 7th day of December, in the year of our Lord nineteen hundred and forty one, and of the Independence of the United States of America the one hundred and sixty-sixth.

"(Seal)              Franklin D. Roosevelt
    "By the President:
        "Cordell Hull
            "Secretary of State"

## Appendix III–A.

"Executive Order 8972

"Authorizing the Secretary of War and the Secretary of the Navy to Establish and Maintain Military Guard and Patrols, and to Take Other Appropriate Measures, to Protect Certain National-Defense Material, Premises, and Utilities from Injury or Destruction

"Whereas the United States is now at war; and

"Whereas there exists a serious and immediate potential danger of sabotage to national-defense material, national-defense premises, and national-defense utilities which may menace our maximum productive effort; and

"Whereas the Congress of the United States has in recent enactments recognized this danger by enjoining efforts to injure, interfere with, or obstruct the national defense, and providing severe penalties therefor; and

"Whereas it is considered necessary in the interests of national defense that, in particular situations where hazardous, dangerous, or other unfavorable conditions may from time to time exist, special precautionary measures be taken by establishing and maintaining military guards and patrols or other appropriate means to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities:

"Now, Therefore, by virtue of the authority vested in me as President of the United States, and Commander-in-Chief of the Army and Navy of the United States, I hereby authorize and direct the Secretary of War, whenever he deems such action to be necessary or desirable, and the Secretary of the Navy, whenever he deems such action to be necessary or desirable, to establish and maintain military guards and patrols, and to take other appropriate measures, to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities, as defined in the act of April 20, 1918, 40 Stat. 533, as amended by the act of November 30, 1940, 54 Stat. 1220, and the act of August 21, 1941, 55 Stat. 655 [50 U.S.C.A. § 101 et seq.].

"This order shall not be construed as limiting or modifying the duty and responsibility of the Federal Bureau of Investigation, Department of Justice, with respect to the investigation of alleged acts of sabotage.

                "Franklin D. Roosevelt
"The White House,
        "December 12, 1941."

## Appendix IV

"Tab 'A'

"Summary of Communication—January 4, 1942

"(Page 23 and 24 'Final Report Japanese Evacuation from the West Coast 1942' by General J. E. De Witt)

"This is the summary by Assistant Attorney General Rowe to the Commanding General of a conversation with the Attorney

General of the United States, and Mr. Rowe's understanding of what the Department of Justice is prepared to do on questions of Alien Enemy Control referred to him by the Commanding General and his staff.

"I. Prohibited Articles.

"Besides cameras, radios and firearms, the articles prohibited by the President's proclamation are to be deposited by all alien enemies with local police authorities by Monday night, January 5, 1942, at 11 p.m. Because sufficient publicity was not given to the requirements that all prohibited articles be so deposited, the Department of Justice will, by release for Tuesday morning, allow all alien enemies at least two more days, say 11 p.m., January 7, to dispose of the articles. An effort will be made to obtain sufficient publicity by radio and in the press.

"2. Restricted Areas.

"The Department of Justice tonight will by wire direct the United States Attorneys in the Western Theatre of Operations, with particular emphasis on Washington, Oregon, and California, to telephone Major General Benedict for recommendations as to what areas should be regarded as restricted. The United States Attorney will automatically accept the General's recommendations, and these areas will immediately become restricted areas pending confirmation by the Attorney General. As soon as possible, a press release ordering all enemy aliens to evacuate restricted areas by a certain date and hour will be issued. Any release by the Department of Justice will specifically state that the Attorney General has designated these restricted areas at the specific and urgent request of the Commanding General. The Army will request the Navy to submit its recommendations through the Commanding General. It is believed several days will elapse before the Army will be ready to submit its recommendations.

"3. Search Warrants.

"New forms for search and seizure of prohibited articles in homes controlled by, or inhabited by, alien enemies, are to be received tomorrow morning by Federal Bureau of Investigation teletype. The question of probable cause will be met only by the statement that an alien enemy is resident in such premises. It is Mr. Rowe's understanding that the local United States Attorney's interpretation that more information is necessary to show probable cause is incorrect. The United States Attorney will issue a search warrant upon a statement by a Federal Bureau of Investigation agent that an alien enemy is resident at certain premises. It is not necessary that the Department in Washington be consulted.

"4. Alien Enemy Registration.

"The Department feels it can conduct an alien enemy registration in the Western Theatre of Operations within a week or ten days. Tomorrow morning by Federal Bureau of Investigation teletype a statement will be sent from Washington outlining a procedure of what the Department is prepared to do. The Department feels it can conduct such a registration, through the local police authorities, much faster than the Army itself. The Department also feels that the existing list from the previous alien registration, now in Washington, is in better shape than is the impression in San Francisco, and every effort will be made to have such lists available in the Western Theatre of Operations.

"5. The Department is willing to make spot-raids on alien enemies tomorrow or at any time after the registration, anywhere within the Western Theatre of Operations. Mr. Rowe emphasized that such raids must be confined to premises controlled by enemy aliens, or where enemy aliens are resident. In other words, the Department cannot raid a specific locality, covering every house in that locality, irrespective of whether such houses are inhabited by enemy aliens or citizens. The Attorney General requested Mr. Rowe to make clear to the Commanding General that under no circumstances will the Department of Justice conduct mass raids on alien enemies. It is understood that the term 'mass raids' means, eventually a raid on every alien enemy within the Western Theatre of Operations. The Attorney General will oppose such raids, and, if overruled by the President, will request the Army to supersede the Department of Justice in the Western Theatre of Operations.

"6. It was agreed by the Commanding General and his staff and Mr. Rowe that certain questions pertaining to raids on localities and the issuance of search warrants, particularly referring to raids on localities in which radio transmitters are probably to be found, will be transmitted to the Department, also for an indication as

to how far the Department would proceed, as a matter of law and policy."

## Appendix V

"Appendix to Chapter II

"Memorandum from the Commanding General, Western Defense Command to the Assistant Attorney General, Mr. James Rowe, Jr.

"(Pages 19 to 23 'Final Report Japanese Evacuation From the West Coast 1942' by General J. L. De Witt)

"January 5, 1942

"Memorandum for: Assistant Attorney General Rowe.

"Subject: Alien Enemy Control Requirements.

"1. Reference is made to the summary of report of the Assistant Attorney General Rowe to General DeWitt on Sunday, January 4, 1942, at 6:30 P.M. (Tab. 'A')

"2. It should be stated at the outset that the Army has no wish to undertake the conduct and control of alien enemies anywhere within continental United States. Impressions to the contrary notwithstanding, the Army would accept transfer of such responsibility and authority with the greatest reluctance. Its desire is only that the Department of Justice act with expedition and effectiveness in the discharge of its responsibilities under the Presidential Proclamations of December 7th and 8th. The developments which have resulted in the current conferences between the Attorney General's representative, and General DeWitt and his staff, have been occasioned by the *almost complete absence of action on the part of the Department of Justice over a period of nearly four weeks since promulgation of the mentioned proclamations, toward* implementing sections 5 and 9.

"3. To the extent that an estimate can now be made, in the absence of actual demonstration, the courses of action proposed to be taken by the Department of Justice, as set forth in paragraphs 1, 2, 3 and 4 of Tab. 'A', appear to constitute a great step forward.

"4. While some amendment, clarification and implementation may be necessary, it appears that section 5 of the proclamation relative to prohibited articles will have been fully implemented when the measures detailed in Tab. 'A' have been taken. The means of determining whether all *alien enemies* are complying with the proscriptions of the Proclamations, as repeated in the contraband regulations promulgated by the Attorney General, may have to be further clarified. This phase of the problem, however, is closely associated with warrant issuance aspect of the alien enemy program.

"5. As agreed in the conference referred to in paragraph I hereof, the Commanding General of the Western Defence Command has initiated action within the California, Oregon and Washington portions of his command (as augmented by the inclusion of the Air Corps installations throughout his command), to furnish U. S. Attorneys not later than January 9, 1942, a list of the areas which are regarded by Army authorities as falling within section 9 of the regulations relative to restricted areas. This report will include definite descriptions of such areas and will divide them into two categories as follows:

"Category A: Those areas within, or through which no alien enemy may be permitted, under any circumstances.

"Category B: Those areas through, or within which alien enemies may be permitted on pass or permit.

"In this connection attention is invited to the concluding paragraph of Section 9 of the regulations which provides in substance that any alien enemy found within any restricted area contrary to the regulations shall be subject to summary apprehension. The military authorities desire to be advised whether, in the opinion of the Attorney General, apprehension of alien enemies under such circumstances may be without warrant and, if so, whether the military authorities are empowered to enforce.

"In order to avoid absolute confusion in the matter, Army authorities strongly urge that the Department of Justice undertake to establish immediate liaison and coordination with all appropriate relief agencies prepared to alleviate hardship resulting from compulsory change of residence on the part of alien enemies residing in Category A, restricted areas. As the Department of Justice has requested permission to announce that the establishment of restricted areas has been made by the Attorney General only because the Commanding General of this theatre has so requested, military authorities desire it to be unequivocally clear that they desire that everything possible be done to elimi-

nate unnecessary hardship and the need for planning and coordination along this line is strongly emphasized.

"Depending upon the manner in which compulsory eviction from Category A restricted areas is handled and upon how the pass and permit system respective Category B restricted areas is developed, the action proposed in paragraph 2 of Tab. 'A' appears presently to provide for full implementation of Section 9.

"6. Comments relative to paragraph 3 of Tab. 'A' entitled 'Search Warrants' will be deferred for inclusion in the portions of this memorandum relative to particular problems.

"7. As already noted, neither the War Department nor the Army desire to undertake responsibility for the alien enemy program in Continental United States. In view of this, the comment in paragraph 4 of Tab. 'A' to the effect that the Department of Justice is of the view that it is better qualified to conduct an alien enemy registration than is the Army, and in view of the expressed intention of that Department to act without delay, it would appear that the action proposed in paragraph 4, Tab. 'A', if speedily accomplished will satisfy the need for immediate registration of alien enemies.

"8. Reference is made to paragraph 5 of Tab. 'A' relative to 'spot raids' and 'mass raids.' The military authorities in this theatre are of the view that counter espionage measures require that the Department of Justice take whatever steps are necessary, effectively to provide for simultaneous 'mass raids' without warning to determine the presence of prohibited articles which may be in possession or under the control of alien enemies, or to which such persons may have access. By this type of raid is meant 'coordinated action' in several areas at the same moment and on successive occasions providing for the search of a given number of alien enemy premises in each area. Under such circumstances the premises to be searched during any such 'mass raid' would be only those in which it is known that an alien enemy may be found or in which there is cause to believe that an alien enemy may be found. It does not mean the 'willy-nilly' raiding of all premises within a prescribed area. The number of premises to be searched during any given 'mass raid' will depend upon the circumstances and the means at hand. This type of sampling or cross-sectional raiding is regarded as vitally important. While such raids may not be successful from the viewpoint of rounding up great quantities of contraband, they will have the important effect of driving contraband more deeply underground with the result that its illicit use becomes increasingly difficult.

"The military authorities request that they be advised by the Department of Justice of its position in this matter. If it is inclined to provide for this type of search, advice is requested as to the steps proposed by this Department.

"9. The courses of action proposed in Tab. 'A', when accomplished, will not solve a number of pressing problems. It is neither possible nor practicable to undertake or attempt to illustrate all of the problems which may arise in connection with the alien enemy program. As limited in the foregoing sentence, some of the problems and some of the questions remaining unsolved are:

"(a) A fix is established on a radio transmitter. Transmission of unlawful radio signals is established but the location is determined only within a defined area such as a city block. Manifestly an accurate description of the premises, the operator's name and a description of equipment can not be furnished. The operation of such a transmitter is equally unlawful on the part of a citizen, alien or an alien enemy. Unless a 'John Doe' search warrant can be obtained and obtained immediately, the consequences may be grave and the transmitter may be moved without trace. What action can be taken?

"(b) The facts are sufficient to support the issuance of an alien enemy warrant or a contraband search warrant, but the responsible law enforcement officer on the ground is unable to communicate with the issuing authority due to the lack of means or because of the time element. What action can he take?

"(c) A known alien enemy is observed, in transit, in the possession of contraband or in the possession of articles believed, for good cause, to be contraband. If a warrant is procured under present as well as proposed machinery, the quarry will be lost. What action can be taken?

"(d) The unlawful transmission of radio signals has been established through interception. A series of fixes determine the location of the transmitter within a

general area, such as Monterey County. Further, there is convincing evidence of shore to enemy submarine communication. What action can be taken to isolate the area and conduct an effective search to locate the mobile unit?

"(e) An alien enemy is resident with a citizen, perhaps a relative such as a wife. While it cannot be proven that he owns or actually controls contraband it can be proven that he has unlimited access to such. The situation is as potentially dangerous as if it could be proven that he owned or actually controlled the contraband. What action can be taken?

"(f) Question arises whether access of the character description in (e) above is unlawful under the Proclamations. Assuming that it is unlawful, to what extent may the search, under a contraband search warrant, of a mixed occupancy dwelling or other premises be carried to determine access to contraband?

"(g) The dual citizen problem is perplexing. Self-serving declarations of an election are of little meaning, particularly where conduct is incompatable with the so-called election. What methods exist or what steps are in contemplation looking toward the control of

"1. Dual citizens.

"2. Disloyal, subversive citizens (where there has been no overt act detected).

"(h) In the opinion of the Attorney General, to what extent may the responsible Military Commander in a theatre of operations, contravene normal processes to take necessary action in an emergency in order to provide for the internal as well as the external security of his theatre—to what extent is the Department of Justice able to take similar measures?

"(i) Military authorities are convinced of the desirability of close cooperation and collaboration between the War Department and the Department of Justice in connection with the instant subject. However, it is considered desirable to request advice as to the extent to which the Department of Justice is prepared to assume and to discharge the responsibility of taking whatever steps are necessary for the prevention of sabotage, espionage, and other fifth column activities from enemy alien courses, and the extent to which the Department of Justice will expect the military authorities to continue the outline of

the necessary steps for progressive implementation of the enemy alien program.

"10. The foregoing represents the consensus of those concerned as understood by the undersigned. It does not necessarily reflect the official opinions of anyone concerned. It is intended primarily as exploratory of the problem.

"J. L. DeWitt,
Lieutenant General,
"Incl. 1. U. S. Army."

Appendix VI

(Pages 7 and 8 "Final Report Japanese Evacuation From The West Coast 1942" by General J. L. DeWitt)

"The Attorney General, on February 9, 1942, formally advised the Secretary of War, by letter, that he could not accept the recommendation of the Commanding General for the establishment of a zone prohibited to enemy aliens in the States of Washington and Oregon of the extent proposed by him. He stated in part:

" 'Your recommendation of prohibited areas for Oregon and Washington include the cities of Portland, Seattle and Tacoma and therefore contemplate a mass evacuation of many thousands * * *. No reasons were given for this mass evacuation * * * I understood that * * * Lieutenant General DeWitt has been requested to supply the War Department with further details and further material before any action is taken on these recommendations. I shall, therefore, await your further advice.

" '* * * The evacuation * * * from this area would, of course, present a problem of very great magnitude. The Department of Justice is not physically equipped to carry out any mass evacuation. It would mean that only the War Department has the equipment and personnel to manage the task.

"The proclamations directing the Department of Justice to apprehend, and where necessary, evacuate alien enemies, do not, of course, include American citizens of the Japanese race. If they have to be evacuated, I believe that this would have to be done as a *military necessity* in these particular areas. Such action, therefore, should in my opinion, be taken by the War Department and not by the Department of Justice.' "

Appendix VII

"(House Report No. 1911, 77th Congress 2nd Session, Page 3)

"February 13, 1942

"Hon. Franklin D. Roosevelt,
"President of the United States,
"White House, Washington, D. C.

"Dear Mr. President: By direction of the Members of Congress from the Pacific Coast States of California, Oregon, and Washington, we submit herewith the recommendations which were unanimously adopted by the members of the Pacific coast delegation present at a meeting held this morning.

"Realizing the seriousness of the Japanese menace along the entire Pacific coast, the Members of Congress from that area have responded to the insistent demands for prompt action in handling this problem by holding several meetings at which the entire matter was thoroughly discussed with the Attorney General and members of his staff, as well as representatives of the War and other departments of the Government. To arrive at a satisfactory solution of the problem of handling not enemy aliens alone, but also disloyal and subversive citizens as well, has not been easy. However, we believe that the program suggested in these recommendations will effectively accomplish our purpose to safeguard the welfare and security of our people and the Pacific coast area.

"Eliminating the question of citizenship and basing our procedure upon the question of *loyalty alone,* we feel that an effective means of reaching our potential enemies can be attained. By utilizing the *military authority* of the Army to effect the partial or complete evacuation of strategic areas, to be determined in size, scope, and location by the military authority, we feel that the Army or the Department of Justice may rightfully remove any or all persons whom they may select from such areas and prohibit their return. This might *require the principles of martial law,* it might inconvenience to greater or lesser extent many loyal and patriotic citizens but we feel the critical nature of the situation and its latent subversive potentialities are so compelling as to justify the taking of extreme and drastic measures.

"We are of the opinion that a complete program calling for the evacuation, removal, resettlement, and rehabilitation of undesirable persons can be effectively carried out without delay provided the various agencies of the Government will immediately cooperate in the utilization of all available facilities at their disposal, and realizing as we do, the seriousness of the present situation, if they will devote a competent staff to the exclusive work of developing a full solution of the problem.

"We therefore urge, Mr. President, that you initiate the steps necessary to accomplish the purpose of these recommendations by calling upon such agencies of the Government as are able and capable of aiding in this program and directing them to utilize such facilities as are available to them in order that our ends may be attained and the people of the Pacific coast as well as of the entire nation may be assured that no steps looking to the safety and security of this Nation from attack from within has been overlooked.

"By direction of the Pacific coast delegation we submit herewith the recommendations adopted this morning.

"Very sincerely yours,
"Rufus B. Holman,
"Mon C. Wallgren.
"Clarence Lea,
"Harry Englebright.
"Richard Welch.
"John M. Costello.
"Homer D. Angell"

"Recommendations of the Pacific Coast Delegation Regarding Alien Enemies and Sabotage

"We recommend the immediate evacuation of all persons of Japanese lineage and all others, aliens and citizens alike, whose presence shall be deemed dangerous or inimical to the defense of the United States, from all strategic areas.

"In defining said strategic areas we recommend that such areas include all military installations, war industries, water and power-plant installations, oil fields and refineries, transportation and other essential facilities, as well as adequate protective areas adjacent thereto.

"We further recommend that such areas be enlarged as expeditiously as possible until they shall encompass the entire strategic area of the States of California, Oregon, and Washington, and the Territory of Alaska.

"We make these recommendations in order that no citizen, located in a strategic

area, may cloak his disloyal or subversive activity under the mantle of his citizenship alone and further to guarantee protection to all loyal persons, alien and citizen alike, whose safety may be endangered by some wanton act of sabotage."

## Appendix VIII

(Page 25 "Final Report Japanese Evacuation From the West Coast 1942" by General J. L. De Witt)

"February 20, 1942

"Commanding General,
"Western Defense Command and Fourth Army,
"Presidio of San Francisco, California.

"Dear General DeWitt:

"By Executive Order, dated February 19, 1942, copy inclosed, the President authorized and directed me, through the Military Commander whom I designate, to prescribe military areas for the protection of vital installations against sabotage and espionage. The cited Executive Order also authorized and directed the administering authority to impose such restrictions upon the right to enter, remain in, or leave any such areas as may be appropriate to the requirements in each instance. Accordingly, I designate you as the Military Commander to carry out the duties and responsibilities imposed by said Executive Order for that portion of the United States embraced in the Western Defense Command, including such changes in the prohibited and restricted areas heretofore designated by the Attorney General as you deem proper to prescribe.

"In carrying out your duties under this delegation, I desire, so far as military requirements permit, that you do not disturb, for the time being at least, *Italian* aliens and persons of *Italian lineage* except where they are, in your judgment undesirable or constitute a definite danger to the performance of your mission to defend the West Coast. I ask that you take this action in respect to Italians for the reason that I consider such persons to be potentially less dangerous, as a whole, than those of other enemy nationalities. Because of the size of the Italian population and the number of troops and facilities which would have to be employed to deal with them, their inclusion in the general plan would greatly overtax our strength. In this connection it may be necessary for you to relieve Italian aliens from the necessity for compliance with the Attorney General's order respecting the California prohibited areas 1 to 88 (Category A). This may appropriately be done by designating, sufficiently in advance of February 24, the said areas as military areas and by excepting Italian aliens from the classes excluded.

"With due regard to your other missions you may use the troops you can now make available from your general command, but for this purpose the 27th Division and the 3rd Division reinforced are not to be considered as part of your general command as such troops are assigned to your command only for specific training.

"Your attention is invited to those provisions of the Executive Order under which you are authorized to call for assistance, supplies, and services from all Government agencies. It is desired that you take full advantage of that authority.

"Removal of *individuals from areas* in which they are domiciled should be accomplished *gradually so as to avoid,* so far as it is consistent with national safety and the performance of your mission, unnecessary hardship and dislocation of business and industry. In order to permit the War Department to make plans for the proper disposition of individuals whom you contemplate moving outside of your jurisdiction, it is desired that you make known to me your detailed plans for evacuation. Individuals will not be entertained until such plans are furnished and you are informed that accommodations have been prepared at the point of detraining.

"So far as practicable, fullest advantage should be taken of voluntary exodus of individuals and of the facilities afforded by other Government and private agencies in assisting evacuees to resettle. Where evacuees are unable to effect resettlement of their own volition, or with the assistance of other agencies, proper provision for housing, feeding, transportation and medical care must be provided.

"I desire that from time to time you make report direct to me of important actions and events, particularly with respect to the extent and location of military areas, and the restrictions applicable thereto.
                    "Sincerely yours,
                    "/s/ Henry L. Stimson,
                         "Secretary of War.
"Incl.
"Executive Order."

## Appendix IX

(Pages 29 and 30 "Final Report Japanese Evacuation From The West Coast 1942" by General J. L. DeWitt)

"Immediately upon the promulgation of Executive Order No. 9066, the War Department, with the approval of the President, requested the Congress to enact legislation to *provide sanctions* for the *enforcement of directives* issued under the authority of the Executive Order. A draft of proposed legislation for this purpose was transmitted by the Secretary of War simultaneously to the Chairman of the Senate Military Affairs Committee, and to the speaker of the House of Representatives. The concurrence of the Department of Justice as to the form and substance of the bill had been obtained.

"The body of each letter of transmittal from the Secretary of War to the Congress read as follows:

" 'There is enclosed herewith draft of a bill entitled "A bill to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, or leaving military areas or zones," which the War Department recommends to be enacted into law.

" 'The purpose of the proposed legislation is to provide for enforcement in the Federal criminal courts of orders issued under the authority of Executive order of the President No. 9066, dated February 19, 1942. This Executive order authorizes the Secretary of War to prescribe military areas from which any and all persons may be excluded for purposes of national defense.

" 'It is impossible to estimate the probable cost to the Government consequent upon the enactment of such legislation.

"The Bureau of the Budget has advised that there is no objection to the submission of this proposed legislation for the consideration of the Congress, as the enactment thereof would not be in conflict with the program of the President.' "

## Appendix X

(Page 30 "Final Report Japanese Evacuation From The West Coast 1942" by General J. L. DeWitt)

"While the legislation was under consideration, the Secretary of War, on March 14, 1942, transmitted another letter to the Congress suggesting an amendment and urging immediate enactment. The letter of March 14th is as follows:

" 'Hon. Andrew J. May,

" 'Chairman, Committee on Military Affairs,

" 'House of Representatives.

" 'Dear Mr. May:

" 'By telephone on Thursday, March 12, 1942, Lt. Gen. John L. DeWitt, commanding the Western Defense Command, requested that action be taken to expedite passage of S. 2352 and H. R. 6758, bills to provide penalties for violation of restrictions or orders with respect to persons entering, remaining in, or leaving military areas or zones.

" 'General DeWitt is strongly of the opinion that the bill, when enacted, should be broad enough to enable the Secretary of War or the appropriate military commander to enforce curfews and other restrictions within military areas and zones. To that end, it is suggested that in line 3, page 1, of H. R. 6758 the word "or" be stricken and that after the word "leave" there be inserted the words "or commit any act in."

" 'General DeWitt indicated that he was prepared to enforce certain restrictions at once for the purpose of protecting certain vital national defense interests but did not desire to proceed until enforcement machinery had been set up.

" 'The War Department recommends immediate passage of the proposed law.

" 'Sincerely yours,
" 'Henry L. Stimson,
" 'Secretary of War.' "

## Appendix XI

(Reporter's Transcript Of Proceedings—Vol. 5, Page 583 line 2, to Page 585, line 1, inclusive)

"Q. By Mr. Ennis: General Wilbur, the Court stated yesterday that the testimony was not entirely clear on the question of how many individuals had been processed in the individual exclusion procedure of the Western Defense Command, particularly how many non-Japanese persons had been processed, and of that number what percentage had been excluded. Can you give us more light on that?

"The Court: I have three figures here that I gathered from the testimony: 120,-000 processed, 150,000 processed, and 200,-000 processed. They were made at different stages in the course of the testimony, and

I thought that might be clarified by some accurate statement, some nearly accurate statement.

"The Witness: 120,000 Japanese-American cases were considered.

"The Court: Individually?

"The Witness: Individually, and processed. I cannot give you as closely as that the figure of German-Americans and Italian-Americans that were considered as individuals and processed. The number will certainly be something between fifty and one hundred thousand. Of that number less than 5 per cent, even less than 4 per cent, perhaps, were given individual exclusion orders.

"The Court: Something less than 4 per cent of 50,000 is quite a different figure than something less than 4 per cent of 100,000, so I haven't got very definite information.

"The Witness: Correct, your Honor. I am afraid I can not tell you, because individual cases were processed by the Army, processed by the Navy, were processed by the FBI. We received reports that an individual was a member of the Bund, and so forth, a large number of those cases, and the great majority of them were cleared. I don't believe that any single agency knows how many German-American cases and Italian-American cases were processed; therefore my figure of percentage is probably valueless.

"The Court: Roughly, you would say there were at least 200,000 individual persons processed in the Western Defense Command?

"The Witness: That is my estimate, sir.

"The Court: And of that there have been approximately 9,000 individual exclusion orders issued and in effect today?

"The Witness: More than 9,000; between nine and ten thousand.

"The Court: Between nine and ten thousand. And of those approximately how many are non-Japanese?

"The Witness: The number now in effect of non-Japanese is very small.

"The Court: Is it approximately a thousand?

"The Witness: It is less than a thousand.

"The Court: It is less than a thousand?

"The Witness: Yes."

## Appendix XII

(Copy of Letter to George Akira Ochikubo, Subject Exclusion, dated August 31, 1944, being Exhibit "A" of Affidavit of Harold W. Schweitzer, Lt. Colonel J. A. G. D.—filed in the within matter)

"Headquarters Western Defense Command

"Office of the Commanding General

"Presidio of San Francisco, California

31 August 1944

"201-Ochikubo, George Akira

"Subject: Exclusion.

"To: George Akira Ochikubo, Central Utah Relocation Project, Topas, Utah.

"1. Under authority of Executive Order No. 9066, 19 February, 1942, and letter of Secretary of War, 26 June 1944, and pursuant to a determination that the present action is dictated by military necessity, you are, pending a hearing before a Board of Officers as hereinafter provided and pending determination of the question to be considered by said Board, prohibited, effective midnight of the date upon which you receive this order, from being in, remaining in, or entering into Military Area No. 1 and the California portion of Military Area No. 2, Western Defense Command, as defined and designated by Public Proclamations Nos. 1, 2, and 16, this headquarters, dated 2 March 1942, 16 March 1942, and 2 March 1943, respectively. The foregoing prohibitions shall extend also to any such additional areas or zones as may hereafter be similarly designated, defined, and established, but in such case a period of ten days from and after the date of the proclamation establishing additional areas or zones will be permitted for complying with the foregoing requirements as to such additional areas or zones. This prohibition shall continue in force until revoked in writing by competent authority.

"2. Without impairing the prohibition in paragraph I hereof, you are hereby exempted from all those provisions pertaining exclusively to persons of Japanese ancestry, contained in the Proclamations, Exclusion Orders, and Civilian Restrictive Orders heretofore issued by the Commanding General, Western Defense Command.

"3. You are hereby notified that a Board of Officers has been appointed by the Commanding General, Western Defense Com-

mand, to consider the question whether military necessity requires the continuance in force of the order set out in pargaraph 1 hereof on the ground that your presence in the areas described in that paragraph is deemed to be potentially dangerous to military security.

"4. You are further notified that on the 9th day of September 1944, at the hour of 10:00 a.m., this Board will be convened at Salt Lake City, Utah, and that you may, if you so elect, appear before it at that time and be afforded an opportunity to present evidence in your own behalf and to answer questions or make a statement under oath or affirmation. You will be advised later of the meeting place of the Board in Salt Lake City. Information is and will be withheld at the hearing to the extent necessary for the protection of confidential information and sources. For your information, it is proposed that you will be interrogated on the following as well as on related matters:

"a. As to your connections in Japan, including family, your family's background, business associates and relatives in Japan.

"b. As to your connections including family, business and other associates in the United States.

"c. As to your educational training and professional connections.

"d. As to your dual citizenship.

"e. As to your participation in meetings at the Central Utah Relocation Project at which you expressed objection to the registration and recruitment of United States citizens of Japanese ancestry for the armed forces, and at which you expressed objection to the temporary transfer of residents of Central Utah Relocation Project to Tule Lake Segregation Center for use in harvesting certain crops.

"f. As to your membership and activities in Japanese nationalistic organizations.

"g. As to any other matters pertaining to your connections or activities.

"5. It is requested that you advise me, in writing, within 3 days after receipt of this notice whether you desire a hearing. If so, a permit in the form customarily used in cases of litigation will be issued to you to enable you to prepare for and attend the hearing. A form of reply indicating your desire in this connection and a penalty, addressed return envelope are inclosed.

"6. For your information and guidance, the following are pertinent regulations concerning the conduct of this investigation:

"a. All matters pertaining to the inquiry are confidential and no publicity will be given them by the Board.

"b. Your appearance before this Board is optional on your part.

"c. You may be accompanied by counsel to act as your personal advisor, to be heard in argument, and if desired, to question you and witnesses called in your behalf. The interrogation of witnesses will be conducted by a member on behalf of the Board, and yourself, unless you desire to be represented by counsel.

"d. You may refuse to answer any question asked by the Board, without assigning any specific reason for your refusal.

"e. Any evidentiary statements by you before the Board must be under oath or affirmation.

"f. The hearing by the Board is in no sense a criminal proceeding; you are not charged herein with the commission of any penal offense.

"7. It is requested that you complete the inclosed questionnaire and present it to the Board on or before the date of the hearing.

"8. Failure to comply with pargaraph 1 hereof will subject you to the criminal penalties provided by Public Law 503, 77th Congress, approved 21 March 1942, [18 U.S. C.A. § 97a] entitled 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.'

"/s/ C. H. Bonesteel
" C. H. Bonesteel
"Major General, U. S. A.
Commanding

"1 Incl.—Questionnaire
"A True Copy
"/s/ Chas A. Middleton
"Chas A. Middleton
"Major, A. U. S."

## Appendix XIII

(Reporter's Transcript of Proceedings—Vol. 1, Page 93, Line 16 to Page 95, Line 5)

"Q. By Mr. Wirin: You testified, I believe, that any Commanding General has the right to set up boards pertaining to the military. The Civil Affairs Division func-

tions in connection with civilians, does it not? A. Yes, sir.

"Q. And it includes, as you testified, aliens, as well as American citizens? A. You say it includes?

"Q. The Civil Affairs Division functions in connection with aliens, as well as with American citizens? A. Yes, sir.

"Q. And it purports to function or have the authority to function, in connection with every person within the Western Defense Command, whether alien or citizen? A. Yes, purely advisory to the Commanding General. It is the Commanding General who functions in the Civil Affairs Division.

"Q. Over Exclusion Orders? A. Yes, sir.

"Q. Now, I asked you whether the function of the Civil Affairs Division, in making recommendations to the Commanding General in connection with the exclusion orders, applies to aliens as well as citizens, and you said it applies to every person within the Western Defense Command? A. Yes, sir.

"Q. To every inhabitant within the area of the Western Defense Command? A. Yes, sir.

"Q. Civilian, as well as military, and alien as well as citizen? A. Yes, sir.

"Q. Judges as well as lawyers? A. Yes, sir.

"The Court: What is the area of the Western Defense Command?

"The Witness: The eight western states of the United States.

"The Court: Is it the same as Ninth Corps Area?

"The Witness: Yes, sir.

"Q. By Mr. Wirin: And every inhabitant within those eight western states are subject to this procedure? A. Yes."

(Reporter's Transcript of Proceedings—
Vol. 5, Page 609, Line 2 to
Page 610, Line 18)

"Q. In connection with the incidents you have told us about, approximating some 25, of persons who have been forcibly excluded from military areas in the Western Defense Command area, are you familiar or have you been advised about the exclusion of Homer Wilcox? A. I don't know enough about it to discuss it. It occurred prior to the time I arrived here.

"Q. Let me ask you this question: Do you know in the case of Homer Wilcox, and perhaps another person, the military officers and the enlisted men arrived at *night time,* do you know about that, at the homes of the persons involved? A. I understand that they did, in the evening.

"Q. And do you know or has it been reported to you in the case of Wilcox, Wilcox refused to allow the military to enter his home, and they entered forcibly—I mean by that, they used enough force to get through the door to his home? A. I suppose that is legal force.

"Q. That is the kind of force which is used, if necessary? A. Yes.

"Q. And if the person who was—

"The Court: Well, specifically, do you mean they broke the door down?

"Mr. Wirin: If I may say so, specifically, they did not break the door down, but they opened a window and then opened the door from the inside by reaching in to the door from an open window; but they secured what lawyers would call, ordinarily, forcible ingress without disturbing the peace of the community, however.

"Q. By Mr. Wirin: And if the person who is being visited by a group of soldiers for removal refuses to go, he is nonetheless taken and removed from the area, is he not? A. Necessary force is used.

"Q. That procedure, the use of all necessary and reasonable force has been applied, as I understand, equally to Japanese and non-Japanese? A. That is correct.

"Q. And is available for application equally to Japanese and non-Japanese against whom there are orders of exclusion which are to be enforced by the Military? A. The question of ancestry has no bearing.

"Q. So far as the use of force in removing a person? A. That is correct."

(Reporter's Transcript of Proceedings—
Vol. 5, Page 565, Line 24 to
Page 568, Line 6)

"The Court: While we are on it, I understand you to say that force as such was not used. Has force been used to enforce an individual exclusion order, other than those alleged in the complaint as to Wilcox and Alexander?

"The Witness: It has, sir.

"The Court: In how many instances?

"The Witness: I cannot answer exactly, your Honor, but I believe it will be something less than twenty-five.

"The Court: Something less than twenty-five?

"The Witness: I believe that is correct.

"The Court: Are they all persons of Japanese descent?

"The Witness: I believe that no one of them is a person of Japanese descent.

"The Court: None of them?

"The Witness: I believe they are all German-Americans. Again, your Honor, I may be—

"The Court: They were persons who were living here?

"The Witness: Yes, in the Exclusion Zone; not only the Military Area, but the Exclusion Zone of the Western Defense Command.

"Q. By Mr. Ennis: General, is my recollection correct—it may have been before you were Chief of Staff—that one American citizen of Japanese ancestry who had returned to Los Angeles was escorted out? A. You are correct. There was one Japanese-American.

"The Court: And about twenty or some odd—

"The Witness: The number is relatively small, your Honor, and the great bulk of them have been German-Americans.

"Q. By Mr. Ennis: Your testimony a few minutes ago about no force was used was addressed to the mass exclusion, no force was necessary? A. That is correct.

"Q. General, can you state the approximate population and size—

"The Court: Wait a minute. Do you know whether or not these people upon whom force was used were citizens or aliens?

"The Witness: I know that some were citizens.

"The Court: You don't know whether or not any of them were aliens?

"The Witness: I think one or two may have been aliens, but I think, in general, they were all citizens.

"The Court: About how long ago was the last occasion for the use of force?

"The Witness: I believe it was in October of 1944, sir.

"The Court: What do you do then when you use force? How does that work? You send a squad of soldiers out and they knock on the door and they just go in and take a fellow wherever he is? What happens?

"The Witness: We attempt to do it as quietly as we can in order not to stir up any local unrest. The last case there were three selected officers and I believe six enlisted men who were sent out to take into custody a German-American who had violated the exclusion order by returning to the Exclusion zone. They moved quietly to his residence, knocked on the door, when the door was opened they went in quietly, told him they were there for that purpose, took control of him, moved him out to the automobiles, and he was escorted to the east out of the Exclusion Zone, taken to a large city in that area and liberated in that area."

### Appendix XIV

"Headquarters Western Defense Command
    "Office of the Commanding General
    "Presidio of San Francisco, California
        "20 January 1945

"Civilian Restrictive Order No. 33

"1. Under the authority of Presidential Executive Order No. 9066, 19 February 1942, and letter of Secretary of War, 10 December 1944, and pursuant to a determination that the present action is dictated by military necessity, particularly the prevention of espionage and sabotage, it is hereby ordered that all persons, while excluded by an individual exclusion order of the Commanding General, Western Defense Command, from any military areas, or exclusion zones within such areas, of the Western Defense Command, are prohibited from possessing, using or operating at any time or place within any military area, as now or hereafter established and defined, of the Western Defense Command, any of the following items:

"a. Military weapons, including all firearms.

"b. Ammunition, bombs and explosives.

"c. Radio transmitters or component parts thereof.

"2. No articles of the types itemized above which, prior hereto have been placed in the custody of any individual, association, organization or corporation within the military areas of the Western Defense Command, shall be returned or otherwise transferred or delivered to any person while such person is excluded by an individual exclusion order of the Commanding General, Western Defense Command, from any military areas, or exclusion zones within such areas of the Western Defense Command.

"3. Any person while excluded by an individual exclusion order of the Commanding General, Western Defense Com-

mand, from any military areas, or exclusion zones within such areas of the Western Defense Company, found with any of the articles itemized in paragraph 1 hereof in his possession in violation of said paragraph 1 will be subject to the criminal penalties provided by Public Law No. 503, 77th Congress, approved 21 March 1942, [18 U.S.C.A. § 97a] entitled: 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.'

"4. Any individual, association, organization or corporation within the military areas of the Western Defense Command in whose custody any articles itemized in paragraph 1 hereof have been placed, who returns or otherwise transfers or delivers such articles to any person, while such person is excluded by an individual exclusion order of the Commanding General, Western Defense Command from any military areas or exclusion zones within such areas of the Western Defense Command in violation of paragraph 2 hereof will be subject to the criminal penalties provided by Public Law No. 503, 77th Congress, approved 21 March 1942, entitled: 'An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones.'

"5. Any individual, association, organization or corporation within the military areas of the Western Defense Command in whose custody any articles itemized in paragraph 1 hereof have been placed, who desires information as to whether an individual to whom he wishes to deliver such articles is excluded from any military areas, or exclusion zones within such areas, of the Western Defense Command, by an individual exclusion order of the Commanding General, Western Defence Command, may obtain such information by inquiry addressed, to the Commanding General, Western Defense Command, attention Civil Affairs Division.

"6. This order does not in any way limit or effect the provisions of Presidential Proclamations No. 2525, dated 7 December 1941, pertaining to the possession, custody, or control of contraband.

"H. C. Pratt
"Major General, U. S. Army
"Commanding."

Appendix XV

(Title 10, Pages 2962 and 2963 Code of Federal Regulations of the United States of America, 1944 Cumulative Supplement)

"Part 3—Arrest and Confinement of Persons Not Subject to Military Law

"§ 3.1 Persons not subject to military law. Persons not subject to military law may be placed in arrest or confinement by members of the Military Establishment, as follows:

"(a) General. All members of the Military Establishment have the ordinary right and duty of civilians to assist in the maintenance of the peace. Where, therefore, a felony or a misdemeanor amounting to a breach of the peace is being committed, it is the right and duty of every member of the military service, as of every civilian, to arrest the perpetrator no matter what his status. For prosecution of petty offenses committed on military reservations see AR 490–5.[1]

"(b) By members of the guard or of military police. Members of the guard or of military police may place persons not subject to military law in arrest or confinement when apprehended while in the act of committing a felony or a misdemeanor amounting to a breach of the peace within the limits of military jurisdiction.

"(c) Restraint. The restraint imposed under the provisions of (a) or (b) above will not exceed that reasonably necessary, nor extend beyond such time as may be required to dispose of the case by orderly transfer of custody to civil authority or otherwise, under the law.

"(d) Ejection. Persons not subject to military law who are found within the limits of military jurisdiction in the act of committing a breach of regulations, *not amounting to a felony* or a breach of the peace, may be removed therefrom upon orders from the commanding officer and ordered by him not to reenter. For penalty imposed upon reentrance after ejection see section 45, act of March 4, 1909, as amended by act of March 28, 1940 (35 Stat. 1097, 54 Stat. 80; 18 U.S.C. 97 [18 U.S.C.A. § 97]) (R.S. 161; 5 U.S.C. 22 [5 U.S.C.A. § 22]) (Par. 4 AR 600-355, July 17, 1942; 8 F.R. 2225)."

---

[1] Administrative regulations of the War Department relating to petty offenses committed by civilians on federal reservations."